UNITED STATES of America,
Plaintiff-Appellee,

v.

William J. SCOTT, Defendant-Appellant.

No. 80–2114.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 20, 1981.

Decided Sept. 18, 1981.

Certiorari Denied Jan. 18, 1982.
See 102 S.Ct. 1252.

Philip B. Kurland, Rothschild, Barry & Myers, Chicago, Ill., for defendant-appellant.

Scott F. Turow, Asst. U.S. Atty., Thomas P. Sullivan, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, FAIRCHILD, Senior Circuit Judge, and PELL, Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

On April 9, 1979, defendant William J. Scott, Attorney General for the State of Illinois, was indicted for wilfully understating his adjusted gross income on his personal income tax returns for the calendar years 1972 through 1975 and for filing a false amended return for 1974. His trial began on January 8, 1980. On March 19, 1980, after five days of deliberations, the jury returned a verdict finding Scott guilty of Count One of the indictment, relating to his 1972 return, but not guilty on Counts Two through Five, relating to his 1973, 1974 and 1975 returns. It is from judgment on this verdict that Scott appeals.[1]

In reviewing Scott's arguments on appeal, we have followed the Supreme Court's admonition that prosecutions such as this should be analyzed "bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation." *Holland v. United States*, 348 U.S. 121, 129, 75 S.Ct. 127, 132, 99 L.Ed. 150 (1954). Nevertheless, we have found no error, constitutional or otherwise, in Scott's trial. Accordingly, we affirm.

## I. The Government's Case Against Scott

Count One of the indictment charged Scott with violating 26 U.S.C. § 7206(1)[2] by wilfully and knowingly preparing and filing a false United States Individual Income Tax Return (Form 1040) for the calendar year 1972 and then verifying this return as true under penalties of perjury. The indictment charged that although Scott stated in his return that his adjusted gross income was $31,643.00, he knew and believed that his adjusted gross income for 1972 was substantially in excess of that sum.

To sustain a conviction under 26 U.S.C. § 7206(1), the proof must show: (1) that Scott knowingly prepared and filed a Form 1040 for the year 1972 which he verified as true; (2) that the return was false in some material way—in this case, that Scott falsely reported his adjusted gross income for the year 1972; and (3) that Scott's actions in falsifying his return were wilful.

In this case, the government relied on two types of proof that Scott falsely reported his adjusted gross income for 1972: the net worth and expenditures method of proof, as approved by the Supreme Court in *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), and the specific items approach.

Under the net worth method of proof, the government was first required to establish Scott's "opening net worth" or total net assets at the beginning of the prosecution year, here, January 1, 1972. The government was then obliged to prove that Scott's net worth increased between January 1 and December 31, 1972, the end of the prosecution period for purposes of this appeal. This it did by calculating the difference between net worth at the beginning and end of the year. To that figure, the government added Scott's expenditures for the year, yielding putative income. The government was then required to show that the likely source of the difference between Scott's reported adjusted gross income and his putative income was taxable income, or that no nontaxable source for the difference existed. *United States v. Massei*, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958). Finally, because the net worth method of proof rests solely on circumstantial and indirect evidence, the government was required to negate all reasonable explanations offered by Scott which were inconsistent with his guilt. *See Holland v. United States, supra; United States v. Hamilton,*

---

1. Scott's post-trial motions for a new trial, judgment of acquittal and arrest of judgment were denied on June 20, 1980. On July 29, 1980, Scott was sentenced to a year and a day in the custody of the Attorney General.

2. 26 U.S.C. § 7206 provides:

 Any person who—

 (1) Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . .

 shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution.

620 F.2d 712, 714 (9th Cir. 1980); *Taglianetti v. United States*, 398 F.2d 558, 562 (1st Cir. 1968), *aff'd*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969); *Davis v. Commissioner*, 239 F.2d 187, 189 (7th Cir. 1956), *cert. denied*, 353 U.S. 984, 77 S.Ct. 1284, 1 L.Ed.2d 1143 (1957).

Pursuant to the specific items approach, the government attempted to show that Scott excluded several material items of his 1972 income from his 1972 Form 1040. Proof that Scott wilfully omitted any one of these items would be sufficient to sustain a conviction under 26 U.S.C. § 7206(1).

The government's net worth proof combined with one of the specific items of income, the Wirtz-Cooper payments, indicated that Scott understated his 1972 adjusted gross income by more than $22,153, for an adjusted gross income of at least $53,796.

### A. Scott's 1972 Form 1040

There can be little doubt that Scott had personal knowledge of the contents of his 1972 tax returns. His accountants prepared his return from worksheets he personally completed. Scott signed the return after verifying it in a private meeting with his accountant. According to Scott's 1972 Form 1040, he earned $30,887 in wages, salaries, tips and other employee compensation, and $756 in interest income, for a total adjusted gross income of $31,643.00. His itemized deductions totaled $13,237, including $12,000 in alimony payments, $150 in medical and dental expenses, $996 in deductible taxes (general sales, state and local income taxes), $140 in charitable contributions, $100 in casualty or theft losses, $175

for the preparation of his tax returns, and $62 for the maintenance of his safe deposit boxes. According to Scott's calculations, $5,448 had been withheld for federal income taxes, but he was required to pay only $4,296. He thus claimed that he was entitled to a $1,198 refund.

### B. Evidence that Scott's 1972 Form 1040 Was False: The Net Worth Case

The government's net worth proof indicated that Scott's net worth increased from approximately $30,253 at the close of 1971 to approximately $51,420 at the end of 1972.[3] The government claimed that the likely source of this increase was campaign contributions which Scott converted to his personal use in 1972. Accordingly, it argued that these contributions became taxable income in 1972 which Scott should have reported on his Form 1040. *E.g., United States v. Miriani*, 422 F.2d 150, 152 (6th Cir.), *cert. denied*, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); *O'Dwyer v. Commissioner*, 266 F.2d 575, 586 (4th Cir.), *cert. denied*, 361 U.S. 862, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); *Paschen v. United States*, 70 F.2d 491, 500 (7th Cir. 1934). Scott, on the other hand, introduced evidence from which the jury could have inferred that the source of the cash expenditures relied on by the government in establishing his net worth increase was nontaxable cash "gifts" he received prior to and during 1972. *See William G. Stratton*, 54 T.C. 255, 280–81 (1970). The government attempted, largely by cross-examination, to bring out that most of the so-called "gifts" were motivated by concern for Scott's needs because of his political career, and, in some

---

3. The discrepancy between the government's proof of Scott's adjusted gross income according to the net worth method and its total claim of Scott's adjusted gross income for 1972 is due to attributing to Scott the salary paid Ellen Cooper by Chicago Stadium Corporation during 1972. *See infra.*

A summary of the government's proof is as follows:

| | December 31, 1971 | December 31, 1972 |
|---|---|---|
| Net worth | $30,253.12 | $51,419.93 |
| Increase in net worth | | $21,166.81 |
| Add: expenditures | | 30,123.90* |
| Subtotal | | 51,290.71 |

| | December 31, 1972 |
|---|---|
| Subtract: nontaxable items and adjustments | 8,551.60 |
| Remainder | 42,739.11 |
| Reported adjusted gross income | 31,643.06 |
| Remainder | 11,096.05 |
| Add: Wirtz payments to Ellen Cooper attributed to Scott as income | 11,057.10 |
| Amount underreported | $22,153.15 |
| Adjusted gross income | 53,796.21 |

* This figure includes Scott's deductible expenses, such as his $12,000 alimony payments, approximately $1,200 in insurance and medical expenses and payroll deductions of $7,245.13.

instances, as a reward for official action beneficial to the donor.[4]

### 1. Opening Net Worth

As its starting point in proving Scott's net worth, *see United States v. Hamilton*, 620 F.2d 712, 714 (9th Cir. 1980); *Kramer v. Commissioner*, 389 F.2d 236, 238 (7th Cir. 1968), the government offered a letter dated April 16, 1968, that Scott wrote to his first wife, now Dorothy Humphrey, from whom he was then separated. In this letter, an apparent effort to arrange a property settlement, Scott described his assets and liabilities in detail. The letter indicated that the Scotts, together, had total assets of approximately $122,000. Their assets included their home, personal furnishings, savings and checking accounts, and stock in Holiday Travel House, Inc., a travel agency they owned jointly. Their only liability was a $28,000 mortgage on their home. Scott proposed that he transfer $93,000 of these assets to Dorothy, including the house, automobiles and bank accounts totaling $10,000, and keep $29,000 in assets for himself, consisting of $18,000 in bank deposits and cash, and the $11,000 worth of stock in Holiday Travel House, Inc. Scott offered to retain the $28,000 mortgage on their house as a liability, which left him with a total net worth in 1968 of $1,000. Scott stated in his letter that he would place this remaining $1,000 in their children's savings accounts.[5]

The government then traced Scott's net worth from April 16, 1968 to December 31, 1971, the eve of the prosecution period. The government's evidence indicated that at the end of 1971, Scott had a net worth of approximately $30,253.

### 2. The Net Worth Increase

Between December 31, 1971 and December 31, 1972, the relevant year for purposes of this appeal, Scott's net worth increased by approximately $21,000, giving him a total net worth at the end of 1972 of approxi-mately $51,420. The evidence showed that most of this increase was reflected in increased savings: in 1972 Scott deposited $21,877 in savings accounts and certificates of deposit. The primary source for these deposits was Scott's paychecks. Indeed, the evidence showed that Scott did not cash a single paycheck in 1972. Instead, he deposited each paycheck in one of his checking accounts or invested them in certificates of deposit, savings accounts or interest bearing securities. Another source for Scott's investments was his reimbursement warrants for state travel, which totaled $2,657 in 1972. When he received them, he generally deposited or invested them: that year, he cashed warrants for only $265.82.

Having introduced proof that Scott's net worth increased between the close of 1971 and 1972, the government then traced Scott's expenditures during 1972. These expenditures would be added to the net worth increase to complete the government's proof of Scott's putative adjusted gross income. This proved to be a difficult task, however, as Scott left few records of his expenses. He wrote no checks to cash during 1972; he used his checking accounts only for expenses mandated by his divorce decree or for his savings and certificates of deposit. Neither did Scott write any 1972 checks for his ordinary living expenses, such as rent, food, clothing, entertainment and gifts for friends and family. Nor did Scott pay for his living expenses by credit card; in 1972 he used only a Holiday Travel House personal credit card for occasional travel expenses.

From this information alone, it can be inferred that Scott paid for almost all of his day to day expenses in cash, cash which he was not reporting as income. This inference is supported by Scott's state travel vouchers which showed that he usually spent cash when he traveled on behalf of

---

4. In reviewing the net worth case against Scott, we are, of course, required to examine the evidence in the light most favorable to the government. *E.g., United States v. Hamilton*, 620 F.2d 712, 717 (9th Cir. 1980); *United States v. Fearn*, 589 F.2d 1316, 1320–21 (7th Cir. 1978).

5. The accounting contained in this letter was corroborated by other documentary evidence and the listings Scott prepared for his 1970 divorce. Scott did not dispute this starting point figure at trial.

the state. As previously indicated, however, he almost always deposited his travel reimbursements in his bank accounts rather than cashing them for future expenses.

Because Scott used cash for most of his expenditures in 1972, the government was forced to calculate the total amount of those expenditures. *Taglianetti v. United States*, 398 F.2d 558, 562 (1st Cir. 1968), *aff'd*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969). The government's evidence showed that Scott spent at least $13,000 in cash during 1972. According to the government's analysis, however, only $3,400 of that total amount was from legitimate sources such as the reimbursement warrants for state travel that he cashed, other cash reimbursements and nontaxable "gifts."[6] Almost $10,000 therefore came from undocumented sources.

Scott spent a large portion of the undocumented income on personal travel. Although he was running for reelection as Illinois Attorney General in 1972, he traveled to Ft. Lauderdale in January, Miami in February, the Bahamas in April, England and Scotland in May, Copenhagen, Nice and Nevada in June, California and Texas in July, Ft. Lauderdale, Miami and Orlando in August, New Orleans, Miami, Ft. Lauderdale, San Diego and Beverly Hills in November, and San Diego, Beverly Hills and Ft. Lauderdale in December. On only six of these trips did Scott pay for any expenses by check. Nor are there credit card

records for any of the travel expenses he most likely incurred. Few of Scott's travel expenses on these trips were charged to or reimbursed by the state,[7] his campaign committee, Holiday Travel House, Inc., or the William J. Scott Host Fund.[8] Only the cash travel expenses that the government was actually able to document were added to the government's calculations of Scott's total cash expenditures and hence to the net worth schedules. Therefore, any undocumented expenditures Scott made during his 1972 travels increased his unreported income for that year over and above the government's proof.

In addition to documenting certain of Scott's travel expenses, the government offered evidence of other large cash expenditures. Scott paid cash for $3,000 worth of traveler's checks in 1972.[9] Additionally, on May 3, 1972, Scott purchased a stamp collection from Malden Jones, a retired news reporter living in Springfield, Illinois. He paid for this collection with a check for $650 and $1,950 in cash. At trial, Scott argued that the cash came from the paycheck he received on May 3, 1972. The evidence showed, however, that he deposited to his bank accounts, or directly invested, every paycheck he received in 1972. He deposited his paycheck of April 26, 1972, on May 3 or 4, 1972, to his account at Illinois National Bank in Springfield, Illinois. Gov't Ex. US–106A. The evidence also showed that in December, 1972, Scott paid for a $950

---

**6.** At least $2,000 of this $3,400 was represented by traveler's checks that Scott purchased in 1972. The disposition of these checks could not be traced because American Express Company had destroyed their copies of the cancelled checks. The government therefore credited Scott with this amount as cash available, even though it was likely that he spent the checks for travel expenses in addition to those estimated, which if documented would have resulted in increasing his case expenditures and his adjusted gross income by $2,000.

**7.** Prior to Scott's visit to Copenhagen and Nice during June, he traveled to Stockholm, Sweden on state business, and he charged his expenses in Stockholm to the state. The state was also charged for his expenses for 4 of the 9 days he spent in Nevada, California and Texas in June and July and for 5 of the 7 days he spent in San Diego and Beverly Hills in December.

**8.** The William J. Scott Host Fund was established in 1970 with the surplus remaining from solicitations collected from Illinois lawyers for a meeting of the National Association of Attorneys General held in St. Charles, Illinois in June, 1970, which Scott hosted. This fund was used in paying Scott's and his family's expenses in attending regional conferences of Attorneys General.

Any of Scott's expenses which either the state, his campaign committee, or the William J. Scott Host Fund paid for were taken into account in the government's net worth proof.

**9.** Not·all of this amount was added to Scott's net worth, however. The government included in its calculations only those traveler's checks of which use could be documented. *See* note 6, *supra*.

diamond ring in cash. Gov't Ex. US–156; E–16.

Many of Scott's ordinary living expenses, such as rent and clothing, were not included in the government's net worth analysis because they could not be documented. For example, although 1972 was an election year, there were no records of Scott's expenditures for clothing. Nor could any rent payments be traced, although the evidence suggested that Scott was living in the Outer Drive East apartment belonging to Leonard Golan. No expenditures for gifts for friends or family could be traced, nor could the government find any records indicating that Scott spent any money on his two children in addition to his monthly child support payments.[10] Finally, the government could trace no expenditures for household goods or services, personal entertainment, or personal care items. The jury could properly have concluded that Scott incurred some expenses for these items which would have added to Scott's net worth increase and expenditures, beyond what the government proved.

The only daily living expense the government included in its net worth calculations was food. Although the government was unable to document any of Scott's food expenditures, his state travel vouchers provided a basis for projecting such expenses. These state travel vouchers indicated that in 1972, Scott spent an average of $8.47 per day on food and drink for each of the 83 days he submitted vouchers. The government then applied this average meal cost to the 283 non-vouchered days for a total projected non-reimbursed food cost of $2,397.01. This amount was then added to the government's net worth schedule. Of course, anything Scott spent on food over that amount would have further increased his net worth and thus the amount of unreported income.

### 3. The Likely Taxable Source

■ Having documented the increase in net worth and the cash expenditures, and thus an excess of putative income over reported income, the government was then obliged to show either a likely taxable source for this increase or that no nontaxable source for the expenditures existed. *United States v. Massei*, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958); *Holland v. United States*, 348 U.S. 121, 137, 75 S.Ct. 127, 136, 99 L.Ed. 150 (1954). The government introduced evidence from which the jury could infer that Scott consistently acquired political contributions and then converted them to his own personal use, making these converted contributions taxable income. *E. g., United States v. Miriani*, 422 F.2d 150, 152 (6th Cir.), *cert. denied*, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970). In this sense, the campaign funds are analogous to trust funds, they are not income when received but become income if and when converted to personal use.

The government's proof indicated that Scott kept the campaign funds he spent for his personal use in several safe deposit boxes. Mrs. Humphrey, Scott's former wife, testified that during November, 1967 she entered two safe deposit boxes she maintained with Scott at the Harris Trust and Savings Bank in Chicago and at the Evanston Bank. She found cash in these boxes totaling $48,900. She put this money into a new box at the Northern Trust. A few days later, after Scott had discovered that the money was missing, she told him what she had done. Scott demanded that she return the money. He told her, she testified, that the money was for his political campaigns and not for his personal use. She then agreed that Scott could become a joint signatory to the Northern Trust box, thereby giving them both access to the box.

The money from the safe deposit boxes was not treated as an asset in Scott's 1970 divorce proceedings because Scott insisted that it was campaign money to be used only for political purposes. Therefore, the divorce decree entered in 1970 provided that the safe deposit box money would go to Scott. The day the decree was entered, Scott and his former wife together surrendered the Northern Trust box. Scott refused to inventory the contents of the box in

---

**10.** During child support hearings in 1977, Scott testified under oath that he spent approximately $184 a month on his children, over and above his child support payments.

her presence. That same day, Scott visited Box 5457D at the Harris Trust. He had opened this box in 1970, the day before the start of the meeting of the National Association of Attorneys General held in St. Charles, Illinois.[11] See note 8, supra.

The $48,900 Mrs. Humphrey testified about was not included in the government's net worth calculations because Scott testified in his 1970 divorce proceedings and again in his 1977 child support hearings that the $48,900 was for political use only.[12] The jury could have inferred, however, that some of Scott's documented cash expenditures came from these funds. Scott entered Box 5457D at the Harris Trust 11 times between January 1, 1972 and June 30, 1972. On May 30, 1972, for example, Scott entered the box, and the next day, May 31, he left on a trip to London, Stockholm, Nice and Copenhagen. If Scott spent any of this $48,900 for his personal use in 1972, then he was required to report that amount as income for that year.

11. Funds for this conference were solicited in Scott's behalf from area attorneys. Edward Barrett, a Chicago lawyer, said that he gave Scott $500 in cash at this meeting. The person in charge of soliciting Host Fund contributions received no cash contributions, however. Within two days of the close of the conference, Scott again visited this box.

12. During the child support proceedings initiated by Mrs. Humphrey in 1977, Scott testified under oath that these safe deposit box funds "were not gifts, they were campaign contributions." Scott told the same thing to Chicago Sun-Times reporter Edward T. Pound, as reported on October 8, 1977.

13. In addition to opening Harris Box 117F to replace Box 5457D, Scott opened Harris Box 144 on May 4, 1972 (surrendered November 5, 1975), and Illinois National Box 2607 on June 23, 1972 (surrendered May 2, 1973), in Springfield, Illinois. Scott had maintained Harris Box 5230 since October 5, 1970, and First National Bank of Chicago Box 44861 since December 9, 1969 (surrendered March 5, 1975).

14. A trip in November, 1972, exemplifies the pattern of safe deposit box entries, travel and personal expenditures. On November 9, 1972, shortly after his reelection as Illinois Attorney General, Scott entered Harris Box 117F. The next day he purchased $1,000 in travelers checks in cash at the First Federal Savings and Loan of Chicago. The same day, he paid cash for another $500 in travelers checks at the

The evidence indicated, however, that the $48,900 Mrs. Humphrey testified about was not the only cash available to Scott. First of all, bank records for 1972, an election year, show a significant increase in Scott's safe deposit box activity. According to Harris Bank records, Scott surrendered Box 5457D on July 18, 1972, for "a bigger box." During the remainder of the election year, Scott opened two more safe deposit boxes, giving him a total of five open safe deposit boxes, including one in Springfield, Illinois.[13] Scott entered his safe deposit boxes 34 times in 1972, often within days before he left the state or his whereabouts were unknown.[14] Due to the remarkable correlation between Scott's entries to these safe deposit boxes and his out of state trips, it can easily be inferred that he kept cash in these boxes which he used for personal expenditures. Even Scott's own expert witness conceded that Scott kept cash in his safe deposit boxes and was spending it.

Harris Bank. On November 12, Scott rented a car in New Orleans. From November 13 to 16, his whereabouts are unknown. On November 17, he called his office from Miami. On November 18 and 19 his whereabouts are unknown, but on November 20 and 22 he called his office from Ft. Lauderale. On November 24, from Ft. Lauderdale, he called Jack Wallenda, an employee who often picked Scott up at the airport. The government could trace only one expenditure from this entire trip which could be attributed to any source other than cash or traveler's checks: a one day rental bill totaling $19.11, which Scott charged to Holiday Travel House.

Gov't Ex. TL-7, compares a few of Scott's 1972 trips with his safe deposit entries:

| Date Of Entry | Safe Deposit Box | Date Of Travel | Location |
|---|---|---|---|
| 2/24/72 | First Nat'l #44861 | 2/28/72 | Baltimore, MD Washington, D.C. New York, NY |
| 5/30/72 | Harris #5457D | 5/31/72 | London, England Glasgow, Scotland Stockholm, Sweden Nice, France Copenhagen, Denmark |
| 6/21/72 | Ill. Nat'l #2607 | 6/25/72 | Lake Tahoe, NV Sacramento, CA Dallas, TX |
| 11/9/72 | Harris #117F | 11/12/72 | New Orleans, LA Ft. Lauderdale, FL |
| 12/22/72 | Harris #144 | 12/26/72 | Ft. Lauderdale, FL |

Second, Scott himself stated, in a 1977 interview with Chicago Sun-Times reporter Edward Pound, that he often received cash contributions from supporters:

Scott explained: There are people who like to make campaign contributions in cash. It was not an unusual thing for people to do in those days before the state campaign reporting law (which took effect in October 1974) .... A guy would say to me, I know you got expenses; here, $1,000. There were people who gave me $500, $1,000 in cash. They considered them gifts. Fundamentally, I treated them as campaign contributions.

Chicago Sun-Times, Oct. 8, 1977, at p. 1, col. 1, introduced into evidence as Gov't Ex. M–8.[15] Both Scott and the government treated Pound's article, without objection, for the truth of the matter asserted.

That Scott converted many of these campaign contributions to his own use can be inferred from the specific instances in which he failed to give his fund raising committee the campaign contributions he had received. Edward Barrett, a government witness, testified that he and his law partner, William J. Kiley, now deceased, gave Scott $5,000 in cash in the summer of 1972. Barrett, whom Scott had appointed Special Assistant Attorney General to handle state condemnation matters, testified that he called Scott and told him that he had a $5,000 campaign contribution. Scott came to Barrett's office to accept the contribution. When he arrived, Barrett and Kiley told him how grateful they were for the business he had given them,[16] and that they wanted to contribute to his campaign. Each of them then handed Scott an envelope containing $2,500 in cash.[17] Scott then said "It's nice to know who your friends are," and pocketed the money. Kiley responded, "Okay, Bill, don't forget where that came from."

Barrett and Kiley were not given receipts from Scott's campaign committee, and their contributions do not appear on any campaign records. Neither did Jack Wallenda, who handled Scott's campaign contributions, receive this money. Moreover, Scott did not report it pursuant to the Disclosure of Economic Interests Law, Ill.Rev.Stat. ch. 127 § 604A et seq. (1973), which requires state officers to disclose any gifts of over $500.

Scott diverted checks meant for his campaign to his personal use as well. On or about April 19, 1972, William Shaffer, an investigator employed by the Attorney General's Office, gave Scott a personal check for $500. A memo at the bottom of the check stated "Campaign Use." Scott endorsed the check and on May 17, 1972, he deposited it in his personal account at First Federal Savings and Loan in Chicago. He did not report this money on his 1972 tax return.[18]

15. Scott consistently acquired these funds without the knowledge of his campaign fund raising organization.

In 1967, Scott's campaign accounts were consolidated into one fund, the "Citizens for William J. Scott for Public Office," (the "Committee") which remained his only fund-raising organization. The Committee was organized to insulate political funds from Scott's personal funds and to provide accounting control over the receipt of campaign contributions and expenditures. It was governed by a board of independent trustees. All campaign expenditures were borne by the Committee through direct payment or reimbursement. All campaign contributions were to be reported to the Committee and deposited to the Committee's account. Beginning in 1972, the Committee began giving currency receipts to all contributors who gave cash in currency rather than by checks. Scott had no authorization to sign checks of the Committee. None of the funds handled by the Committee were included in the government's case against Scott.

16. In some years, Barrett earned over $100,000 from the state.

17. Barrett testified that he had made campaign contributions to Scott prior to this time, usually by check. Barrett said that he and Kiley decided to give this particular contribution in cash, however, so that Scott could "use it for any campaign purpose that he wanted to use it for, so it didn't have to be earmarked for luncheons or dinner committees, or posters or whatever, and that was that." Barrett had no documentary evidence of giving Scott the money, however, and could not say where the money came from.

18. Shaffer gave Scott a second check, this time for $200, on August 18, 1972. The memo on this check stated "In place of dinner in Septem-

The government also introduced evidence showing that Scott had previously converted campaign contributions to his personal use. Mr. Harry Ash, of Inheritance Abstractors, Inc., testified that on November 6, 1968, his company purchased a $4,000 cashier's check made payable to "Scott Campaign Committee." The government showed that Scott personally endorsed this check and negotiated it at the American National Bank for cash on October 3, 1969. In April, 1970, Inheritance Abstractors again purchased a cashier's check, this time in the amount of $2,500 and payable to Scott's Campaign Committee. The evidence showed that Scott gained possession of this check and endorsed it "Citizens for W. J. Scott for Public Office." He negotiated it with the Investment Department of National Boulevard Bank, where he had formerly been a vice-president, on May 15, 1970, as part payment for a $7,000 U. S. Treasury Note he purchased for himself on that date.

Ash testified that he and Inheritance Abstractors, Inc., intended these checks to be used solely by Scott's Campaign Committee, and that he never imparted any contrary intention to Scott. Nevertheless, the evidence showed that Scott converted these funds to his own use. He did not report the proceeds of these checks on his tax returns.[19]

The government also argued that no nontaxable source for Scott's cash expenditures existed. See United States v. Massei, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958). The government showed that during the net worth period, Scott had received no inheritance, other than stamps and coins from his father which he had not sold, and no insurance benefits. He did receive the proceeds of a single loan in 1970, totaling only $1,500 and reflected in the government's net worth figures. For this argument to succeed, however, the jury would have to reject Scott's interpretation of the testimony of the thirty-three witnesses as establishing nontaxable cash "gifts" to Scott, during or before 1972.[20] See William G. Stratton, 54 T.C. 255, 280–81 (1970).

### 4. Investigation of Leads

After introducing proof that Scott's net worth increased during 1972 due to campaign contributions diverted to his personal use, the government demonstrated that it had investigated all reasonable leads provided by Scott as to nontaxable sources of income which, if true, would establish his innocence. Holland v. United States, 348 U.S. 121, 135, 75 S.Ct. 127, 135, 99 L.Ed. 150 (1954). Scott presented various leads to the Tax Division of the Department of Justice in a conference held on March 27, 1979 with the Division lawyers.[21] A letter submitted shortly after the conference, on March 30, 1979, detailed these leads. The government spent considerable time at trial proving that these leads had been investigated and accounted for in the net worth analysis.

---

ber." (A campaign fundraising dinner for Scott was held in September, 1972.) Scott kept this check until May 2, 1973, when he negotiated it at the Illinois National Bank in Springfield. He entered his safe deposit box at that bank on the same day. Scott did not report the proceeds of this second Shaffer check on either his 1972 or 1973 tax returns.

**19.** The court allowed this evidence to establish Scott's net worth at the beginning of 1972. It was also admissible for the issue of Scott's wilfulness, as it indicated a consistent pattern of underreporting of income. E.g., Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). Before the testimony was admitted, the court informed the jury that they were to consider this evidence only for the limited purpose of establishing Scott's net

worth as of the opening date of the prosecution period. Tr at 1631.

**20.** Scott's version of the facts will be discussed in Part II, infra.

**21.** The Tax Division had approved the case for prosecution in February, 1979. It then relinquished jurisdiction over the case to the United States Attorney in Chicago. Scott, through his counsel, requested a conference with Division lawyers after the case had been turned over to the U.S. Attorney in Chicago. At the request of the U.S. Attorney, the Tax Division took the case back in order to give Scott an opportunity for a conference. This activity took place under considerable time pressure, as the statute of limitations on Scott's 1972 tax return was to expire on April 15, 1979.

Some leads were shown to be false exculpatory statements made by Scott or through his counsel.

In this letter of March 30, 1979, Scott claimed that he had used the safe deposit box monies discovered by Mrs. Humphrey to repay himself for unreimbursed political expenses. He alleged that he was owed $14,000 from his 1964 gubernatorial campaign and $35,000 from his 1968 campaign. The government introduced considerable evidence to rebut this claim.

As to the 1964 debt, the accountant for Scott's 1964 campaign testified that he had examined all of the 1964 campaign records and found nothing indicating that anyone, including Scott, had incurred unreimbursed expenses during that campaign. Moreover, in January, 1965, supporters held a testimonial dinner for Scott for the purpose of repaying any remaining campaign expenses and raising money for future campaigns. After all of the dinner expenses and all the known 1964 campaign debts had been, paid, $51,466.84 remained, all of which was deposited in the William J. Scott Continuing Fund and the William J. Scott Dinner Committee Fund, both of which were campaign accounts. Scott sought no reimbursement from the proceeds of this dinner, and the dinner chairperson testified that he could not recall Scott mentioning any unpaid campaign expenses. Finally, the government introduced evidence that, based on his 1964 tax returns and work papers, Scott had insufficient funds available in 1964 to make the $14,000 in expenditures claimed.[22]

The government also introduced records from Scott's 1968 campaign. These records showed no unreimbursed expenses. Indeed, on October 18, 1967, Scott wrote a letter to Elliott Frank, trustee of Scott's newly formed "Citizens for William J. Scott for Public Office" (the "Committee"), see note 15, *supra*, regarding the manner in which he was to be reimbursed for political expenditures he personally incurred. In this letter,

Scott stated that he would forward the invoices of any new expenditures so that the Committee could make the payments directly. He then wrote, "I will also turn over a monthly list of my personal political expenses for reimbursement." During 1967, all of 1968, and on through the indictment years, Scott kept meticulous records of his political expenses, which the Committee then reimbursed. For example, his reimbursement requests for 1968 included $606 for political secretarial services, Gov't Ex. C–5, as well as $4 baby-sitting expenses and baggage tips, Gov't Ex. C–6. In early January, 1969, he submitted a final tally of "1968 Political Expenses of William J. Scott Not Previously Recovered," Gov't Ex. C–11. This tally totaled $546.69 and again, covered everything from dinner and transportation expenses to $1.50 baggage tips. The jury could infer from this evidence that Scott had not spent $35,000 in personal funds in 1968 for political purposes without seeking reimbursement. Moreover, the government introduced testimony that Scott had insufficient personal funds available to make such expenditures in the first place.

In the March 30, 1979 letter, Scott also stated that until February, 1975, he was a major shareholder in, chief executive officer of, and primary salesman for the Holiday Travel House, Inc. He was therefore able to travel on Holiday House business and at its expense during the prosecution years. He further alleged that he received free airline travel and lodging on special occasions, and was able to purchase travel tickets at a 75% discount.

The government rebutted this lead by demonstrating that its net worth calculations credited Scott with any reduced rate or free travel he had obtained: the schedules were based solely on Scott's documented expenditures and assumed no full price travel on his part. Nor did the government treat as income any reimbursements Holi-

---

**22.** In 1963, Scott reported a disposable income of $10,104 (taxable income less Federal income taxes paid) and in 1964, his reported disposable income was $9,750.

day Travel House may have given Scott.[23] Thus, Scott's claims regarding his travel costs had no impact on the government's net worth calculations.

The March 30, 1979 letter also contained eight subparagraphs purportedly describing sources of cash available to Scott. The first subparagraph referred to attached documents, which were photocopies of purchaser's copies of two bank drafts. Each draft was for $2,500, and payable to Mrs. Mary Abelson and William J. Scott, respectively. The letter stated that Scott did not have the original checks, but that the one to Mrs. Abelson was reendorsed to William J. Scott, and that he cashed both drafts in 1971. At trial, the government showed that Mrs. Mary Abelson and not Scott had in fact endorsed and negotiated the check made out to her, contrary to Scott's assertion. As to the check made payable to William J. Scott, the government proved that Scott had not cashed the check, but rather had used it to purchase Treasury Notes.

The second purported source of cash listed by Scott in the letter was a cashier's check on the LaSalle National Bank dated May 10, 1968, in the amount of $5,000. The government introduced evidence showing that this money was deposited into the savings account that Scott and his first wife maintained at Harris Trust & Savings Bank.

The third subparagraph listed a National Boulevard Bank document dated February 23, 1971, indicating that Scott received $5,000 in Treasury Notes due on November 15, 1971. The sixth subparagraph referred to a letter from the National Boulevard Bank dated December 16, 1970, stating that Scott possessed $7,000 in U.S. Treasury Notes due on November 15, 1971. The government's evidence indicated that both of these paragraphs referred to the same transaction, which began with a check payable to Citizens for Scott for Public Office and ended with the $7,000 being turned into

certificates of deposit, rendering it unavailable as cash.

The fourth subparagraph referred to a National Boulevard Bank document stating that Scott received a $5,000 U.S. Treasury Bill due on January 31, 1971. The government's evidence indicated that the proceeds of this Treasury Bill were used to purchase the two bank drafts referred to in the first subparagraph, the checks payable to Mrs. Mary Abelson and William J. Scott, thereby providing no evidence of cash available to Scott.

The fifth subparagraph listed three possible sources of cash. The first was a National Boulevard Bank record reflecting 1966 ownership of World Airways Stock. Government evidence showed that Scott had originally purchased 700 such shares. He sold 600 of them in 1966. The remaining 100 shares he sold for $2,225 in 1967, the proceeds of which he deposited in his Harris Bank account. The second alleged source of cash listed in this paragraph referred to the same transaction previously listed in subparagraphs four and one, thus providing no cash for Scott. Finally, the third source listed in subparagraph five was the same transaction listed in paragraphs three and six.

There were no documents attached in support of the seventh subparagraph, which implied that Scott, at some point in time, owned 80 units of securities in Loew's Theatres, Inc. Scott referred to no such interest in any of his income tax returns filed between the late 1960s and 1975, nor did he include it in any Statements of Economic Interest filed with the Illinois Secretary of State. Neither was it referred to in the property settlement between Scott and his first wife. A government witness contacted Loew's for evidence of any investment held by Scott but testified that Loew's had no records of any such investment. In short, the government could uncover no evidence indicating that Scott had any cash available from that source.

The eighth subparagraph purported to list six withdrawals from Scott's checking

---

23. The government introduced evidence that Scott's contact with the agency after his 1970 divorce from his first wife, Mrs. Humphrey, was minimal.

accounts during 1967, for a total of $16,000. Government evidence showed that three of these listings were the same transaction. None of them resulted in any cash being available to Scott. Rather, these checks for cash were simply deposited into savings accounts or other accounts maintained by the Scotts.

Finally, between March 27, 1979 and April 2, 1979, Scott provided the Tax Division of the Department of Justice and the U.S. Attorney with the names of 100 persons who allegedly made cash "gifts" to Scott. Prior to the indictment, various Internal Revenue Service agents attempted to contact these people on these lists for information about their purported "gifts." The government introduced memoranda reporting these contacts as evidence of its efforts to investigate leads. The memoranda stated that of the persons contacted, seventy-five reported that they gave only nominal amounts to "pass-the-hat" funds for Scott's birthday or Christmas presents.[24] Two of the people Scott listed did not exist, and sixteen could not be reached prior to the return of the indictment. The remaining individuals reported several different things. One stated that he had loaned $1,500 to Scott in 1970 which had never been repaid. This sum was already reflected in the government's net worth figures. One remembered making one payment of $500, which the government showed was deposited into Scott's campaign account. Another could recall giving Scott no money after the late 1960s, and yet another reported making no contributions of any nature. Two persons refused to talk to the government agents. Only one person said that he gave "gifts" between the early 1960s through 1976 which perhaps totaled $1,000. He was called as a government witness.

C. *Evidence That Scott's 1972 Form 1040 Was False: The Specific Items Of Omitted Income*

The government introduced several specific items of income that Scott failed to report on his 1972 Form 1040. The largest of these were: the $5,000 Edward Barrett and William J. Kiley gave Scott in the summer of 1972; the payments Arthur Wirtz, a Chicago businessman, made to Ellen Cooper, whom Scott married in 1974; and the $500 check for "campaign use" which William Shaffer gave Scott in April, 1972, and which Scott converted to his own use in May, 1972. Proof that Scott willfully failed to include any one of these specific items in his adjusted gross income as reported on his 1972 Form 1040 would be sufficient to sustain Scott's conviction, regardless of the government's net worth proof.

The government used the $5,000 Barrett payment in its net worth proof as a likely source for some of Scott's cash expenditures. Standing alone, however, there was sufficient proof from which the jury could infer (1) that this payment was a campaign contribution Scott converted to his own use in 1972, thereby rendering it taxable income he was required to report; or (2) that it was a payment made for the improper purpose of influencing official conduct. *United States v. Isaacs*, 493 F.2d 1124, 1144–45 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). If the jury concluded that it was a payment made for the purpose of influencing official conduct, Scott was required to report it as income in the year he received it—1972. *Id.* at 1161. It was clear from Scott's 1972 Form 1040 that he did not report it under any label.

The second item of specific income Scott omitted from his 1972 Form 1040 was the $11,057.10 in payments Arthur Wirtz made to Ellen Cooper during 1972. The government contended that Wirtz made these payments as a favor to Scott because as Attorney General, Scott possessed regulatory and enforcement powers over many of Wirtz' businesses. *See United States v. Kuta*, 518 F.2d 947, 950 (7th Cir.), *cert. denied*, 423

---

**24.** Most of the persons in this category were employed by Scott in the Attorney General's office.

U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).[25] Therefore, Scott should have reported these payments, as "the first principle of income taxation [is that] income must be taxed to him who earns it," *United States v. Basye*, 410 U.S. 441, 449, 93 S.Ct. 1080, 1085, 35 L.Ed.2d 412 (1973); *Commissioner v. Culbertson*, 337 U.S. 733, 739–40 (1949), and not some other person who receives or spends it.

In order for the jury to understand the government's theory regarding the Wirtz payments, the government introduced evidence of the history of financial dealing between Scott and Arthur Wirtz, a prominent Chicago businessman.[26] Wirtz testified[27] that he or his family owned a variety of companies operating in Illinois, including businesses in real estate, banking, liquor distribution, horse breeding, sports teams and exhibitions, furniture, restaurants, hotels, insurance, engineering and mortgage banking.

Wirtz served on the sponsoring committee for Scott's January 1965 testimonial dinner. At that time, Scott was Treasurer for the State of Illinois. As treasurer, Scott deposited $525,000 into a no interest account at the First Security Trust & Savings Bank of Elmwood Park, a bank owned by the Wirtz family and run by Wirtz' son, William. Almost $4.5 million dollars was in that account in 1966.

Scott left the office of state treasurer in January, 1967. Shortly thereafter, he contacted Wirtz about the possibility of starting a private law practice. Wirtz testified that Scott told him that he was finished with politics and needed a retainer.[28] Wirtz agreed to help out. In February, 1967,

three Wirtz-owned corporations paid Scott a retainer of $27,000. Wirtz testified, however, that he could not recall having any legal or professional contact with Scott in 1967 or 1968. In response to a subpoena *duces tecum*, Wirtz searched his personal and corporate records for evidence of any legal work performed by Scott in either 1967 or 1968 but could find nothing. Nor could Wirtz recall Scott actually performing any legal work.

Scott campaigned actively for the Office of the Attorney General throughout 1968. After his election, Scott called Wirtz and said that he would like to clean up his account. Wirtz told Scott to take it up with his son, William. Wirtz testified that he told William to settle the matter with Scott, saying "you don't get any place by making enemies." Scott was then paid $20,000 by checks drawn on various Wirtz corporations.

As Attorney General, Scott executed state leases in a Chicago building owned by a Wirtz company. Rentals over the years totaled $215,000. Scott's 1972 campaign occupied office space in the same building at a nominal charge, often consisting only of utilities, which in some months were as little as $3 or $4.

Wirtz testified that in either late 1971 or early 1972, Scott approached Wirtz and told him that "he had a friend named Ellen Cooper for whom he would like to find a job with one of the Wirtz companies." Wirtz told Scott that he "would be glad to find a spot for her" and that she should call his executive secretary, Gertrude Knowles. Cooper was placed on the Chicago Stadium Corporation payroll, which Wirtz described

**25.** In *Kuta*, this court upheld a Chicago alderman's conviction for extortion, and for failure to report the extorted funds on his tax forms, in violation of 26 U.S.C. § 7206(1).

**26.** Prior to Wirtz' testimony, the jury was instructed that they could consider this evidence solely for the purpose of determining the nature of the relationship and course of dealings between Scott and Wirtz so as to "shed light on the knowledge and intentions of both the

Wirtzes and Scott regarding the payments . . . to Ellen Cooper in 1972. . . ." Tr. at 2934–35.

**27.** Wirtz testified under a grant of immunity from the United States.

**28.** Scott maintained his campaign fund accounts, however, throughout this period. By October, 1967, he had declared his candidacy for Attorney General of Illinois.

as a "confidential" account. Wirtz personally signed her payroll checks, which in 1972 totaled $11,057.10.[29] Wirtz testified that he saw Scott again in late 1973. At that time Scott told him that he was going to marry Ellen Cooper. Although Wirtz couldn't recall the details of the meeting, they agreed that "she ought to terminate our services." She was then removed from the Wirtz payroll.[30]

The evidence indicated that Cooper did nothing to earn these payments. Wirtz did not meet Cooper until some time after he put her on his payroll. None of the other Wirtz employees could remember meeting her until 1979. Neither could Wirtz find any attendance records, work product, employment application, or any other personal or corporate records related to Cooper. Moreover, throughout 1972, while Cooper was purportedly employed by Wirtz, she received a salary for serving as secretary to Scott's re-election campaign. She often traveled with Scott during this period, and numerous campaign documents prepared during 1972 contain references to her campaign role.

On cross-examination, Wirtz flatly denied making the payments to Cooper out of fear of Scott. Wirtz admitted, however, that he knew that Scott, as Attorney General, had enforcement powers over many of the Wirtz businesses.

Based on the evidence surrounding the Wirtz payments to Cooper, the government's tax expert concluded that this money should be attributed to Scott. Scott made all the arrangements enabling Cooper to receive the money and it could be inferred that he had earned it. There is no evidence that Cooper did anything to earn the money.

Another specific item of income Scott omitted from his 1972 Form 1040 was the $500 check Scott received from William Shaffer in April, 1972 marked "campaign use." Scott deposited this check into his personal account in May, 1972. The government used the payment in its net worth proof as evidence that Scott converted campaign contributions to private use. Because Scott converted this campaign contribution to his own use by placing it in his personal checking account, it became income to him which he should have included on his 1972 Form 1040. He failed to do so.

Other specific items of income Scott should have included in his 1972 adjusted gross income were the savings Scott incurred by fraudulently obtaining discounts on his Air Jamaica flights to the Bahamas and Jamaica during 1972. In late 1971 or early 1972, the Air Traffic Conference of America ruled that Scott was ineligible for reduced rate eligibility due to his being a full-time employee with the State of Illinois, which disqualified him for discounts as either an owner or as an outside salesman. Gov't Ex. HT–64–1. On both January 19, 1972 and again on March 15, 1972, however, Scott wrote to Air Jamaica requesting reduced air fare from Chicago to Nassau, Bahamas, round trip and from Chicago to Nassau to Montego Bay, round trip, respectively. In both letters, he certified that he had been in the service of Holiday Travel House continuously for the past twelve months and was devoting all or substantially all of his time on behalf of the House to the promotion and sale of travel, as required by the I.A.T.A. regulations regarding reduced rates. He further certified that the requests were made in good faith. Gov't Ex. A–4 and A–5. *See* note 23, *supra.*

Finally, to the extent that the jury could find that Leonard Golan provided Scott with a rent-free apartment in the Outer Drive East building during 1972 for the

---

**29.** Cooper declared these payments on her 1972 and 1973 tax returns, and payroll deductions were made by the Chicago Stadium Corporation.

**30.** Had she stayed on the Wirtz payroll after the marriage, Scott would have had to disclose that income on his state economic interest statements.

purpose of influencing Scott's official conduct, *United States v. Isaacs*, 493 F.2d 1124, 1144–45, *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), rendering Golan's action non-cash income, the value of the rent on that apartment for 1972 becomes a specific item of income that Scott omitted from his Form 1040. There was evidence from which the jury could draw such a conclusion. Scott often appointed Leonard Golan and his law firm as Special Assistant Attorneys General. Between 1969 and 1979, Golan and his firm earned $1,159,594 from such appointments. Golan, who had two other residences, ordered an extra key to his Outer Drive East apartment twelve days after Scott's divorce. Jack Wallenda, who served as Scott's chauffeur, testified that he occasionally dropped Scott off at this building or picked him up there. Wallenda also stated that Scott kept his clothes at this apartment.

If Golan lent Scott his apartment in 1972 in order to influence Scott's conduct, then Scott was required to report the rental value of this apartment as income on his Form 1040. He did not.

### D. *Evidence Regarding Scott's Wilfulness*

 The final element necessary to the government's case against Scott is evidence of Scott's wilfulness in underreporting his adjusted gross income for 1972.

> [Willfulness] may be inferred from conduct such as . . . making false entries or alterations, or false invoices or documents, . . . concealment of assets or covering up sources of income, handling one's affairs to avoid making the records used in transactions of the kind, and any conduct, the likely effect of which would be to mislead or conceal.

*Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943).

In this case, the government argued that wilfulness could be inferred from the manner in which Scott handled his financial affairs. Scott, a lawyer and an experienced banker who was once Treasurer of Illinois, invested almost all of his money derived from ordinary and legitimate sources, such as his paychecks or his state travel reimbursements, in high yield interest bearing securities or certificates of deposit. All of these funds were perfectly traceable, and from the evidence, it is obvious that Scott seldom let such funds remain idle, without earning any interest.

The very fact that Scott kept any money, regardless of its source, in safe deposit boxes seems out of character for a man who so carefully invested and earned interest on his other funds. The secreting of large amounts of cash in safe deposit boxes can itself be evidence that the cash did not come from legitimate sources simply because of the evident motivation to avoid records. This fact, coupled with his lack of records for living and travel expenses, as well as the unreported but taxable sources the jury could properly find, provides a sufficient basis from which the jury could infer that Scott was wilfully concealing his income. Scott's original defenses to the charges against him, as evidenced by the leads he submitted to the Tax Division of the Department of Justice on March 30, 1979, *see* Part I–B–4, *supra*, are further evidence of wilfulness, as the jury could have believed these to be false exculpatory statements, evidencing an intent to mislead or conceal. *Id.*

### II. The Defense Case

 The burden of persuading the jury beyond a reasonable doubt that the defendant had income which he wilfully failed to report remains with the government at all times. *Holland v. United States*, 348 U.S. 121, 138, 75 S.Ct. 127, 136, 99 L.Ed. 150 (1954).

In a net worth case, however, the government is deemed to have established a *prima facie* case when it has proved putative income in excess of the income reported, the existence of a likely source of taxable income, *id.*, and an effective negation of reasonable explanations by the taxpayer incon-

sistent with guilt. *Id.* at 135, 75 S.Ct. at 135. The government does not have the burden of disproving every possible nontaxable source of available funds. This is a reasonable rule, for if there is in fact such a source, evidence to demonstrate it is usually within the defendant's possession and control. *Id.* at 138, 75 S.Ct. at 136. *See Rossi v. United States,* 289 U.S. 89, 91–92, 53 S.Ct. 532, 533–534, 77 L.Ed. 1051 (1933). At this point in the trial, the defendant, unless he elects to rely solely on the jury's finding some reasonable doubt, remains quiet at his peril. *Id.* 348 U.S. at 138–39, 75 S.Ct. at 136–137; *United States v. Cramer,* 447 F.2d 210, 218 (2d Cir. 1971), *cert. denied,* 404 U.S. 1024, 92 S.Ct. 680, 30 L.Ed.2d 674 (1972); *United States v. Vardine,* 305 F.2d 60, 63 (2d Cir. 1952).

Accordingly, Scott presented 32 witnesses who testified that they made cash "gifts" to Scott prior to and during 1972.[31] He also presented his own expert witness on net worth computations. These witnesses, together, testified to giving Scott approximately $25,930 in cash between 1968 and 1975. If their testimony was believed, and accepted as establishing nontaxable "gifts," Scott would have had approximately $10,162 in cash on hand at the end of 1971, all from nontaxable "gifts." These witnesses testified to giving Scott another $5,187 in cash during 1972. The cash on hand at the beginning of 1972 and received during 1972 would have been sufficient to offset the government's calculations of Scott's net worth expenditures deficit of $11,096 plus the unsubstantiated travel and personal living expenses established by circumstantial evidence.

From our reading of the record, however, the jury could have perceived serious problems with these witnesses' testimony. Only one of them had records of the "gifts" and none of them could testify to the exact amount given Scott in any one year. Without exception, Scott's estimates of the available cash on hand from these "gifts" was based on the witnesses' highest estimate, even though that estimate may have been reduced on cross-examination. Of the 33 "gift" witnesses, only seven had been included in the list of more than 115 names submitted to the Department of Justice in March and April of 1979. One of those seven had testified as part of the government's case, and one had given contrary testimony to the grand jury. None of them was mentioned in Scott's accountings of his assets for his divorce proceedings in 1970 or child support proceedings in 1977.

Several contributions to Scott can be eliminated immediately, as the evidence showed that these contributions were either recorded in Scott's campaign records or were included as a nontaxable source of cash in the government's calculations.[32] $1,700 of the 1968–72 cash "gifts" were from William Shaffer: $700 was given in 1972, and, as previously discussed, was clearly intended for campaign use; the remaining $1,000 was given in 1968, and, according to Shaffer's grand jury testimony, was also intended for campaign use.

Of those witnesses who testified, eleven, representing total "gifts" between 1968 and 1972 of $6,039.00 either had close relatives employed by Scott or were themselves in his employ either at the time they testified or at the time they gave him money, or both. It is clear from some of these contributors' testimony that they gave money to Scott because of his official acts in hiring their relatives. For example, one witness testified: "[We] felt very grateful to Bill Scott for giving my brother a chance to retain some dignity, hold his family together [by giving him a job] . . . . So my mother

---

**31.** An additional "gift" witness testified during the government's case in chief. *See* Part I–B–4, *supra.*

**32.** J. D. Quarant's "gift" of $100 in 1968 was recorded as a campaign contribution. Tr at 7880. Scott reported William A. Barnett's 1972 "gift" of $750.00 on his state Disclosure of Economic Interest forms, pursuant to Ill.Rev. Stat. ch. 127 § 604A *et seq.* (1973). This "gift" was included as a nontaxable cash source in the government's schedule.

made out a check for $300 and I gave $300 in cash at the same time." Tr at 5748–49. The jury could have decided that these payments were compensation for official acts and therefore income rather than nontaxable gifts. *Commissioner v. Duberstein*, 363 U.S. 278, 285, 80 S.Ct. 1190, 1196, 4 L.Ed.2d 1218 (1960).

Finally, of the 32 witnesses who testified on behalf of Scott, most were "friends" through their political involvement with Scott. Many of them testified that they gave money to Scott whenever they saw him at political functions, such as a "Friends for Scott" gathering or the annual Republican chicken fry in Decatur, Illinois. When asked why they gave Scott cash, typical responses were:

> I had been in politics myself and I knew that the man needed money for various reasons, and I wanted to help. I liked him. . . . [A] politician goes into a county, . . . and someone may come up and say "Will you buy this ticket to our little fundraising thing in this county?" . . . and they have got to do it.

Tr at 5614; or:

> As I stated before, I again feel that many elected officials deserve a whole lot more than what they get for the performance and the sincerity [with which] they serve the people of the State of Illinois or the government, and that was my contribution of—continuing to do a good job.

Tr at 6651; or:

> On many occasions I would run into Scott and let him know how I appreciate the job that he was doing in office, and consequently I would let it be known by giving him a little gift that I felt he needed.

Tr at 5427.

Scott contends that the payments just described were not campaign contributions because they were unrestricted as to use.

Neither were they income in the sense of compensation for services. Rather, he contends, they were nontaxable "gifts."

The court instructed the jury that political contributions which are diverted to personal use are includable in gross income in the year in which the funds are used personally; and that a payment in return for services rendered is income rather than a gift, even if the person who makes the payment receives no benefit from it. The court further instructed:

> To constitute a gift within the meaning of the tax laws, a payment must be made from a detached and disinterested generosity—that is, without any selfish interests—out of impulses such as affection, respect, admiration or charity.

> The characterization of his actions applied by the person who made the payment is not determinative. There must be an objective inquiry by you, considering all relevant factors, in determining whether what is called a gift is correctly placed in that category. The decision as to whether individual payments are gifts or income or political contributions is a question of fact for you to determine in the light of practical human experience, applying the tests that I have given to you.

> If you find that a payment was a gift, as I have defined it, then that payment does not constitute income and need not be reported on an income tax return.

Tr. at 9172. These instructions are not challenged.

Conceivably the jury disbelieved some of the testimony of the "gift" witnesses. Or it may have interpreted their testimony as showing campaign contributions. Or it may have concluded that payments were so motivated as to constitute compensation for official acts.[33] Or the jury may have decided, at least to the extent of reasonable

---

**33.** The jury could have believed that the witnesses gave money to Scott because of his services as a candidate for office or as a public officer. Such payments could arguably constitute income taxable upon receipt. The government did not rely on this latter theory at trial,

doubt, that these payments were in fact nontaxable gifts, made from a "detached and disinterested generosity." *See Commissioner v. Duberstein*, 363 U.S. 278, 285, 80 S.Ct. 1190, 1196, 4 L.Ed.2d 1218 (1960).

The latter determination as to all such testimony would mean rejection of the government's net worth case, and would be consistent with acquittal on other counts, but, as will be pointed out, would not require acquittal on Count One.

Scott's net worth expert witness adopted some of the government's own calculations but made several crucial assumptions in arriving at his estimate of Scott's adjusted gross income for 1972, which was equal to that reported by Scott.[34] First of all, the defense expert calculated Scott's net worth as of December 31, 1971 to be $49,583.30 rather than the $30,253.12, calculated by the government. Much of the difference between the two starting points is explained by the testimony of Scott's witnesses, who, if believed, gave Scott $10,162 in unrestricted "gifts" between 1968 and the end of 1971. Moreover, he assumed that $12,000 in Scott's bank accounts had not come out of Scott's available cash or any other source disclosed by the evidence. Second, the defense expert assumed that every one of the "gift" witnesses testified honestly and accurately, and that none of the money they gave Scott constituted campaign contributions or income. This assumption was made in spite of the circumstances under which many of the payments were made or the witnesses' contrary testimony before the grand jury or on cross-examination. This assumption also meant that Scott had lied during his divorce proceedings and child support proceedings. Third, Scott's expert assumed that Scott spent no money on food between 1968 and 1975, other than that accounted for on the travel vouchers he submitted to the state. Finally, the expert did not attribute to Scott the payments made by Wirtz to Cooper during 1972, even though the expert admitted that there was no evidence that Cooper had worked for Wirtz.

### III. Questions on Appeal

The government had fulfilled the requirements of a net worth and expenditures case by the time it rested. It had produced proof from which the jury could determine Scott's net worth at the close of 1971 and the increase in his net worth during 1972. It had shown substantial cash expenditures. Necessarily from these facts Scott must have had substantial receipts not reported as income. The government had shown that the likely source of such receipts was the conversion of campaign funds, making it taxable income. The Barrett and Shaffer

---

and its failure to do so operated to Scott's benefit. We do not rely on this theory, either. The I.R.S. guidelines, however, state that once it is shown that contributions to a political candidate were intended for the unrestricted personal use of the candidate, then the *Duberstein* principles apply in determining whether the funds are nontaxable "gifts." *William G. Stratton*, 54 T.C. 255, 280–81 (1970). *Duberstein* excludes payments proceeding from a sense of moral or legal duty or from the incentive of anticipated benefit of an economic nature, as well as payments made in return for services rendered, even if the donor derives no economic benefit from the payment. *Commissioner v. Duberstein*, 363 U.S. at 285, 80 S.Ct. at 1196, *supra*, citing *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 730, 49 S.Ct. 499, 504, 73 L.Ed. 918 (1929), *Bogardus v. Commissioner*, 302 U.S. 34, 41, 58 S.Ct. 61, 64, 82 L.Ed. 32 (1937), and *Robertson v. United States*, 343 U.S. 711, 714, 72 S.Ct. 994, 996, 96 L.Ed. 1237 (1952). It seems therefore arguable, although unnecessary to decide here, that money given a political candidate because he or she is a political candidate, may be income to the candidate upon receipt, if its use is not restricted to campaign purposes.

**34.** Defendant's Exhibit 98 calculated Scott's adjusted gross income for 1972 as follows:

Computation Of Adjusted Gross Income

| | 1/1/72 | 12/31/72 |
|---|---|---|
| Net Worth | 49,583.30 | 65,454.12 |
| Increase | | 15,870.82 |
| Add: Expenditures | | 28,760.78 |
| Increase in Net Worth and Expenditures | | 44,631.60 |
| Deduct: Non-Taxable Receipts and Adjustments | | 12,988.60 |
| Computed Adjusted Gross Income | | 31,643.00 |
| Reported Adjusted Gross Income | | 31,643.00 |
| Additional Adjusted Gross Income | | -0- |

items not only were shown to be converted campaign funds, but could well have been found to be taxable income as a payment motivated by defendant's official position. The government showed that it had conducted a reasonable investigation of any leads suggesting an exculpatory explanation, and had found none.

At trial, Scott offered testimony in an effort to show that the money the witnesses gave him prior to and during 1972 was not restricted to use in his political campaigns. To the extent the jury relied on the government's net worth proof, it must have either disbelieved the testimony as to restriction, or as to 1972 payments, must have found that the intent which would make the money nontaxable "gifts" was lacking.

A. *Claims of Trial Error*

1.

■ Scott challenges the following instruction: "In the absence of evidence to the contrary, the law presumes that contributions to a politician are political funds, not intended for unrestricted personal use of the politician."

Scott contends that this instruction invaded the jury's function, and that the error is of constitutional dimension. It is not clear, however, in what way the presumption would be prejudicial, given the facts of this case, even if erroneous.

Scott's suggestion that it affected the issue of the asserted gifts has no foundation. The presumption, by its own terms, does not apply to the payments testified to by the so-called gift witnesses, for each of them testified that the funds were intended for Scott's unrestricted personal use, and

there was thus "evidence to the contrary" of the presumption.

The presumption has no significant effect on payments such as Barrett's, where the only evidence was that the payment was a campaign contribution (and it was at least inferable that the contribution was intended to influence official conduct).

Another area suggested by Scott, and hereafter discussed, involved funds which went into the segregated campaign accounts, and were not claimed to have been diverted to Scott's personal use. With one possible exception, ($3,000 cash collected at a fund raising event, handed to Scott, and turned over by him to a campaign fund) the presumption could not have had any effect on those funds.

In any event, we do not deem the instruction erroneous.

The jury must have understood "contributions to a politician" as meaning transfers of money to a politician (here Scott), without any apparent consideration or motivation other than his activities of a political nature. The instruction is almost a truism. It recognizes the very high degree of probability that anyone who gratuitously transfers money to a politician does so to help him meet campaign expenses. Wherever there is evidence that a transfer was intended for unrestricted personal use, the presumption no longer exists.[35]

This presumption is based on IRS Revenue Rulings[36] and has been explicitly adopted by the Tax Court. *See David W. Carson*, 71 T.C. 252, 259 (1978); *see William G. Stratton*, 54 T.C. 255, 280–81 (1970).[37]

Defendant asserts that this instruction "shifted the burden of proof to the defendant."

---

**35.** The instruction, by its very terms, does not require a preponderance of the evidence, or any other measure of evidence before it is rebutted and drops out of consideration. We therefore conclude that no reasonable juror could have understood this instruction as requiring Scott to prove by "some quantum of proof which may well have been considerably greater than 'some' evidence" that the contributions were not for political purposes.

**36.** IRS Rev.Proc. 68–19 is incorporated by reference into Rev.Rul. 71–449, 1971-2 C.B. 77, which in turn is clarified in Rev.Rul. 74–22, 1974–1 C.B. 16.

**37.** In *Stratton* the court stated:

The line between an outright gift and a campaign contribution is a very thin line. Nevertheless, the IRS in Rev.Proc. 68–19, *supra*, recognizes that a political candidate may receive outright gifts excludable from gross

In considering the challenge, it is important to place the presumption in perspective. The presumed fact, that contributed funds are political, not intended for unrestricted personal use, is not an element of the crime charged, as was true of the presumed facts in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and *Ulster County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). Standing alone, indeed, the presumed fact establishes that the contribution is not income, and need not be reported. It is a link in a chain of proof tending toward guilt only when coupled with other proof that funds were diverted to personal use. The presumption played no part in showing specific unreported amounts of taxable income. Whatever effect it had was in establishing a likely source of taxable income, one of the requirements of the circumstantial, net worth expenditures method of proof. In the manner this case was submitted to the jury the presumption could have contributed to a finding of guilt only in supporting the probability of a taxable source of putative income proved by the net worth method. As to this theory, and all other theories of the case, the instructions emphasized that guilt could not be found unless proved beyond a reasonable doubt. We perceive no possibility that the jury could have understood the instruction as shifting the burden of persuasion to the defendant in any degree. *Cf. Jacks v. Duckworth,* 651 F.2d 480, 485–487 (7th Cir. 1981).

As later pointed out, the verdict of guilty may well have not rested on the net worth method of proof, and if that be true, the presumption had no effect on the verdict.

Moreover, although the presumption was phrased in mandatory form, it so clearly would vanish upon the appearance of "any" evidence to the contrary, whether part of the government or defense proof, that its impact was no greater than that of a permissive inference. *See Ulster County Court v. Allen, supra,* 442 U.S. at 158, fn. 16, 99 S.Ct. at 2225 fn. 16, 2nd paragraph. It clearly met the test as such.

The presumption is an entirely rational recognition of the probabilities of the situation. Defense counsel, indeed, implicitly endorsed it in asking one of Scott's campaign officials:

Q. It's certainly reasonable to assume that when someone sends a check to a candidate, normally that money is to be used in his campaign.

A. Yes Sir.

Thus it is clear that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend. *Leary v. United States,* 395 U.S. 6, 36, 89, 1532, 1548, 23 L.Ed.2d 57 (1969).

2.

Scott challenges rulings excluding evidence that certain funds were intended by the contributors for his unrestricted personal use. In each instance, the funds were not personally used by Scott, but went into the segregated campaign accounts. In all but one instance the contribution was made by check payable to the campaign committee.

Obviously this evidence would not have shown money in Scott's hands which he may have used in the expenditures proved

---

income under section 102(a), I.R.C.1954. Section 5 of Rev.Proc. 68–19 provides:

The Service will presume in the absence of evidence to the contrary that contributions to a political candidate are political funds which are not intended for the unrestricted personal use of such recipient. If it can be shown that the funds were intended for the unrestricted personal use of the political candidate, then the Service will apply the principles set forth in *Commissioner v. Mose Duberstein, et al.,* 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218

(1960), Ct.D.1850, C.B. 1960–2, 428 and *Max Kralstein, et ux.,* 38 T.C. 810 (1962), acquiescence, C.B. 1963–2, 4, to determine whether or not the funds may be excluded from his gross income under section 102 of the Code. *Id.* at 280–81. These revenue rulings should be followed by the federal courts unless clearly inconsistent with federal law. *Commissioner v. O. Liquidating Corp.,* 292 F.2d 225, 231 (3d Cir.), *cert. denied,* 368 U.S. 898, 82 S.Ct. 177, 7 L.Ed.2d 94 (1961). Needless to say, we have found no such inconsistency.

by the government. His theory of relevancy is that it tended to show nontaxable gifts to him which he then devoted to campaign expenses. Such use of his personal funds would then arguably give him the right to use other campaign funds in his possession for personal purposes, without tax consequences.[38] The theory seems farfetched and improbable at best, but there are other reasons supporting the court's ruling.

Scott attempted to introduce the testimony of numerous witnesses in support of his theory. These witnesses can be classified into three groups. The first group of excluded witnesses would have testified that their checks made payable to Scott's campaign committee, which were deposited and cleared through the committee's accounts, were really intended to be "gifts" to Scott. As the court pointed out during the sidebar conference on the admission of such testimony, in order for Scott to reimburse himself for spending these personal gifts on his campaigns, he first had to know of their existence. Scott's attorneys were unable to explain to the court how Scott could reimburse himself for the personal "gifts" he gave his campaign if he didn't know such "gifts" belonged to him in the first place. Without such an explanation, the court refused to admit the proferred testimony. We find no abuse of discretion in this particular ruling. Without any evidence that Scott had any knowledge or control of these "gifts," the testimony of these witnesses failed to meet the basic relevancy requirement of the Federal Rules of Evidence.

The second group of excluded witnesses would have testified that their checks were payable to Scott's Committee and were delivered to either Scott or the Committee, but that they told Scott at some point that the money was his to spend any way he wanted. These checks were cleared through the Committee's accounts, and were never reported in Scott's economic interest statements as gifts.

This testimony would have supplied proof of Scott's knowledge of the intention of the contributor not to restrict the use of the money to a particular purpose, but it would not explain why the checks were made out to the Committee. It fell short of showing an offer to give money over to Scott's control, followed by his direction that the check be made out to the campaign committee. Moreover, as already pointed out, a contribution in contemplation of a campaign, even though unrestricted as to use, does not fully establish the type of motivation essential to a nontaxable gift under *Duberstein*. The court nevertheless indicated it would admit this testimony if defense counsel represented that evidence would later be introduced to show that defendant relied on a belief that these transactions entitled him to divert a like amount of other campaign funds to his own use.[39] Defense counsel declined to make the representation. We find no abuse of discretion in refusing admission pending introduction of the missing evidence.[40]

The third type of witness Scott wanted to offer in support of his reimbursement theory was an individual who had raised $3,000 in cash at a 1972 fund raiser for Scott, held in Oak Brook, Illinois, $500 of which the individual himself contributed. Jack Wallenda, whose job was to receive and record general campaign contributions, in addition to serving as Scott's driver, had previously testified that Scott gave him all of this money. Wallenda deposited it in the Committee's account and gave receipts to the

---

**38.** Persons who run for public office may reimburse themselves for any personal funds spent on their campaigns without any tax consequences. *E.g.,* Rev.Proc. 68–19, 1968–1 C.B. 810, 811 (1968). The evidence showed that Scott's campaign fund regularly reimbursed him for costs he had personally incurred in his campaign. *See* Part I–B–4, *supra*.

**39.** The court made it clear that Scott's attorneys could introduce other evidence that Scott acted in reliance on the witnesses' statements, other than Scott's own testimony.

**40.** The court's ruling conformed with Fed.R. Evid. 104(b) and Fed.R.Evid. 611(a).

individual and the other contributors at the fund raiser. Scott's attorneys originally wanted the individual to testify that when he gave Scott the $3,000, he said, in front of everyone at the fundraiser, "you can spend this anyway you want," thereby expressing the intent to give Scott an unrestricted gift.

The court ruled that the individual could not testify as to the donative intent of the other contributors, but only as to his own $500. And as to the proffered testimony regarding the individual's own $500 contribution, the court ruled that such testimony would be similar to that proffered to the second group of witnesses. The court therefore required the same predicate, especially since Scott himself had sent the individual a letter saying: "Thank you for your generous contribution to my campaign fund for reelection as Attorney General of the State of Illinois." In ruling, the court said:

> Mr. Barnett, I have to rule on the state of this record at this stage. I also have Mr. Scott's testimony under oath in the Circuit Court of Cook County [to the extent that his only income was from salary and investments]. And absent some other predicate for this testimony, whether from the defendant or someone else, the testimony is inadmissible at this stage.

Tr at 5851.

There was no testimony as to the size of the group present when the money was handed to Scott and the statement made to "spend this anyway you want." Depending on the circumstances it could well be reasonable to accept the spokesman's statement as binding on each contributor present, none having objected. So assuming, however, the statement went only to lack of restriction on use. The fund raiser seems clearly to have been for campaign purposes, and a lack of restriction on use does not establish the type of motivation essential to a nontaxable gift under *Duberstein*. It is most improbable, on the face of it, that persons attending and giving money to a fund raising affair in connection with a political campaign do so out of the detached and disinterested generosity required under *Duberstein*. The fact that cash came into Scott's possession before he put it into the campaign committee channel makes the correctness of the court's ruling a closer question than in the other instances, but we do not find an abuse of discretion under the circumstances.[41]

3.

Scott further contends that the government unfairly commented on his failure to produce and to stipulate to certain evidence, thereby implying that he had the burden of producing exculpatory evidence.[42]

Scott stops short of claiming that the government commented on his failure to testify, and the record shows no such comment, direct or indirect. The statements and arguments to which Scott objects were appropriate and justified when considered in the context of this case.

Scott first directs attention to the prosecutor's summation, merely citing 12 pages of the transcript, suggesting that the prose-

---

41. These three groups of excluded witnesses should be distinguished from the thirty-three other "gift" witnesses, most of whom testified that they had given Scott cash. Some of these witnesses were also offered in support of Scott's reimbursement theory. For example, Scott offered witnesses to testify that they gave him cash and told him he could use it any way he wanted. Scott then turned this cash over to his campaign committee. The court ruled that such testimony would be admitted because it was relevant for showing how Scott treated monies given him directly.

42. Criminal defendants are not usually required to produce documents requested by the govern-

ment. In a criminal tax prosecution such as the present case, however, if the government cannot prove that it investigated all leads provided by the defendant, the court may prevent the government's case from going to the jury. *Holland v. United States*, 348 U.S. 121, 135–36, 139, 75 S.Ct. 127, 135–36, 137, 99 L.Ed. 150 (1954). Moreover, once the government has presented its *prima facie* case, the defendant "remains quiet at his peril," as he is usually the individual most able to come forward with evidence of his nontaxable income. *Id.* at 138–39, 75 S.Ct. at 136–37.

cution pointed to Scott's failure to supply evidence the prosecution wanted.

We have carefully examined these references and find them legitimate argument based on the evidence. In part, they questioned the credibility of defense witnesses, pointed out inconsistencies between the defense at trial and the pre-indictment explanations to the Department of Justice, argued that false explanations demonstrated wilfulness, commented on the failure of evidence to support theories advanced by the defense, and commented on Scott's practice of spending cash to avoid creating records.

Scott next cites 14 pages of the transcript in support of an assertion that the government improperly showed that Scott had failed to supply leads for investigation.

Each of these instances took place during the testimony of defense witnesses called to testify regarding cash gifts to Scott.[43] Either before or after cross-examination of the defense witness, the government asked for a stipulation that this particular witness was not on the list of donors Scott provided to the Justice Department in March and April, 1979. Each time, a defense attorney, Mr. Thomas, so stipulated, although Mr. Barnett, another defense attorney, stated a continuing objection. The court allowed the government to request these stipulations, stating that the government had the burden to prove that it tracked down all leads.

 The government had a clear right to show that the witnesses produced at trial were not on the list furnished by defendant before indictment. In a net worth case, the government was required to show that it investigated leads provided by defendant to show availability of cash inconsistent with guilt. *Holland v. United States,* 348 U.S. 121, 135, 139, 75 S.Ct. 127, 135, 137, 99 L.Ed. 150 (1954).[44]

 Moreover, the government may properly comment on the inconsistencies in a defendant's case. *See United States v. Bubar,* 567 F.2d 192, 199 (2d Cir.), *cert. denied,* 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). It was legitimate to point out that although defendant had offered alleged explanations before indictment, he had offered different ones at trial.

Under the circumstances, we do not deem it an abuse of discretion to permit the government to use the technique of requesting a stipulation. It was clear that the government was in a position to establish the fact suggested, and the stipulation technique was expeditious.

Scott's third claim of unfair comment relates largely to a comment which the court permitted the United States Attorney to make in response to defense tactics which the court deemed unfair to the government.[45] As this was a net worth and expenditures case, the government needed to introduce hundreds of documents, includ-

---

**43.** The exception is the dialogue at Tr 6382, which takes place in chambers. There, Mr. Barnett states his continuing objection to the government's comments.

**44.** In this regard, the jury was instructed as follows:

If you find that the government has not adequately investigated the leads or explanations offered by the defendant, you must take those explanations being as true.

Tr 9186.

**45.** Scott also objects to the government's reference to stipulations in its opening statement, stating that such remarks might cast a burden on Scott. The only time the government mentioned stipulations in its opening statement is

when Mr. Margolis, an Assistant United States Attorney, explained that a number of document witnesses would testify as to the "bits and pieces" of evidence needed to understand Scott's financial life and his travel expenditures. He stated:

Now to the extent we can[,] we will get these documents submitted to you by stipulation, which is an agreement among counsel. And we will attempt to streamline the proof as best we can, and spend as little time as possible in that area.

Tr 410. We have difficulty understanding how this single statement would tend to cast a burden on Scott, especially because Mr. Margolis also stated, several times, that the government had the burden of proof.

ing canceled checks and hotel records, in order to establish Scott's expenditures for each year and thus, his increased net worth. Prior to trial, therefore, the government asked Scott's attorneys to stipulate to the authenticity of many of the documents the government needed to prove Scott's expenditures. Scott's attorneys agreed to simple business record stipulations for a few of the documents, but refused to do so for many others. This was Scott's right. The government was therefore obliged to lay a foundation for each such document before introducing it into evidence. This required calling the custodian of each set of documents as a witness.

Yet in at least two instances at trial, Scott's attorneys sought to exploit unfairly the government's need to call witnesses to testify to the foundations of the various documents for which Scott had earlier refused to stipulate.

The first such incident took place during the testimony of the government's handwriting expert, Jack Calvert. He had been called to identify Scott's signature on a number of documents, including cancelled checks and Scott's tax returns because Scott had repeatedly refused all of the government's offers to stipulate to his signature. After Calvert had arranged all his exhibits and had been sworn as a witness, defense counsel, in the presence of the jury, suddenly offered to stipulate to Scott's signature. Scott then left his seat at counsel table and personally examined each exhibit, appearing before the jury to readily agree that the handwriting in question was his own.

The second incident took place during the cross-examination of another document witness, a Mr. Hoobler. Hoobler had been called by the government to testify regarding Scott's registration card at a hotel in San Diego, California. The card indicated that Scott had stayed at the hotel from December 30, 1973 to January 3, 1974, and

had paid cash for his $100 charge.[46] Mr. Bugliosi, one of Scott's attorneys, then proceeded with cross-examination:

By Mr. Bugliosi: Q. Mr. Hoobler, the documents that comprise Government Exhibit H–45, did you send them to Mr. Margolis pursuant to a subpoena?

A. Yes, sir, I did.

Q. You did not testify before the Grand Jury in this case?

A. No, sir, I did not.

Q. You did not send these documents to the Grand Jury?

A. No, sir, I did not.

Q. Where do you live, sir?

A. In San Diego, California.

Q. So you flew here before this trial?

A. That is correct.

Q. Did you arrive last night?

A. This morning.

Q. Are you going back today?

A. Yes, sir.

Q. The amount of money involved here is about $100 on Government's Exhibit H–45?

A. Yes, sir.

Tr at 2262. No further questions were asked on cross-examination. The government, after objecting to the cross-examination, called for a sidebar conference. After this conference, Mr. Sullivan, the United States Attorney, then made the following statement to the jury, a statement which Scott now claims was prejudicial error:

Ladies and gentlemen of the jury, there are hundreds of documents in this case, business records with records custodians from all over the country and some from out of the country. Long ago the government offered to stipulate to the foundation testimony of each of these documents so as to save your time, our expense, and the witness' inconvenience, as well as his Honor's time.

We made that offer long before this trial ever got underway.

---

**46.** Obviously, this item of proof is irrelevant to Scott's 1972 net worth and the conviction appealed from. We consider the incident, however, in the event that it tainted the 1972 case.

Tr at 2269. Mr. Barnett, another of Scott's attorneys, then stated to the court and jury that the defense was attempting to go over documents to arrange for stipulations.[47]

The district court did not abuse its discretion by allowing the government to make the statement regarding its offer to stipulate, given the cross-examination alluding to the cost of Scott's prosecution. This court has previously stated:

> [A]n appeal to the pecuniary interest of the jurors [is] unquestionably an unacceptable predicate for argument in a criminal trial. Since pecuniary interest would necessarily disqualify a prospective juror from service, it is patently improper to make an appeal to that interest in closing argument.

*United States v. Trutenko*, 490 F.2d 678, 679 (7th Cir. 1973).[48] *See United States v. Falk*, 605 F.2d 1005, 1012 (7th Cir. 1979),

*cert. denied*, 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980). Here, Scott's attorney was appealing to the pecuniary interest of the taxpayer.[49] Such an appeal cannot be tolerated from the defense any more than it can be allowed by the government. In this instance, the defense, by its conduct, almost invited this statement from the government. *See United States v. Isaacs*, 493 F.2d 1124, 1164–65 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).[50]

**B. *The Failure of Proof Arguments***

Scott next challenges the sufficiency of the evidence against him, both as to the government's net worth case, and as to the specific items of income he failed to report.

### 1. (a)

Scott challenges the government's net worth case on several grounds. He

---

47. Mr. Barnett: May I further then, Your Honor, state that we have and are attempting to go over documents in order to arrange for stipulation?

 The Court: That is correct, Mr. Barnett. You are. But in light of Mr. Bugliosi's cross examination of this witness as to whether the Government is bringing in this witness all of the way from San Diego to prove a $100 expenditure, I held that Mr. Sullivan's comment was proper. Tr 2270.

 In response to Mr. Sullivan's statement to the jury, Scott moved for a mistrial and to disqualify Mr. Sullivan on the grounds of unconstitutional conduct. OR 134, "Defendant's Motion to Disqualify Thomas P. Sullivan as an Attorney for the United States in this Proceeding"; OR 135, "Defendant's Motion for an Order Declaring a Mistrial." The court denied these motions, stating, at sidebar:

 > I have all the motions, and I also have your motion to disqualify Mr. Sullivan, and that motion is denied. I think what happened yesterday afternoon is reflected in the record. My ruling was not based entirely—my ruling in allowing Mr. Sullivan to make the comment that he did was not based entirely on the incident of yesterday afternoon but it was coupled with the demonstration of stipulation when the expert witness [Mr. Calvert] came in to testify after having been—all morning we knew he was going to testify, getting his exhibits all set up, and then [the defense attorneys] went through the procedure before the jury of stipulating in front of the jury. Mr. Bugliosi's cross examination can

 only be heard and/or read in one way, and that was to unfairly criticize the Government for calling a witness to establish an expenditure of $100. As we all know, this is a net worth prosecution. If the Government had that expenditure and didn't show it, it may be fatal to their case. The cross examination was improper, and that is why I allowed Mr. Sullivan to make the comment that he did. Tr 2353–54.

48. *Trutenko* involved a statement made by the prosecutor in closing argument. Although we said such a statement was "undeniably improper," we found it to be harmless error. *United States v. Trutenko*, 490 F.2d at 679, *supra*.

49. That he made his point to the jury is evidenced by a juror's question immediately following Mr. Sullivan's statement:

 > A Juror: May I ask a question?
 > The Court: Yes.
 > A Juror: Did the taxpayers pay for that gentleman to come here for a $100 ticket?
 > The Court: That's right.

 Tr 2270.

50. Moreover, any possible harm caused by Mr. Sullivan's statement was cured by Mr. Barnett's immediate response, *see* note 47, *supra*, and by the court's instructions to the jury regarding stipulations: "Refusal to stipulate should not be held against any party." Tr 9146.

first argues that the government failed to establish a likely taxable source for his increase in net worth. *See Holland v. United States*, 348 U.S. 121, 137, 75 S.Ct. 127, 136, 99 L.Ed. 150 (1954). He contends that the government proved only that the likely source for Scott's expenditures during 1972 was the cash in his six safe deposit boxes, and not that the money in those boxes was taxable income in the 1972 year. If some of these monies were from bribes or extortion or other illegally obtained funds as the government suggested, they were taxable income the year in which Scott received them and not in the year they were spent. Thus, Scott argues, the government itself proved that the money in these boxes was not taxable income in 1972. Scott did not present this argument to the jury, nor did he make it to the district court in his motions for acquittal at the close of the government's case or at the close of all the evidence or in his post trial motions.

The question for us on appeal, then, is whether, looking at the evidence in the light most favorable to the government, *e. g., United States v. Fearn*, 589 F.2d 1316, 1320–21 (7th Cir. 1978), there is substantial evidence tending to show that the likely source of Scott's net worth increase was taxable funds or that no nontaxable source for the expenditures existed. *United States v. Massei*, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958); *Holland v. United States*, 348 U.S. 121, 137, 75 S.Ct. 127, 136, 99 L.Ed. 150 (1954); *United States v. Mackey*, 345 F.2d 499, 507 (7th Cir.), *cert. denied*, 382 U.S. 824, 86 S.Ct. 54, 15 L.Ed.2d 69 (1965). The funds would be taxable income to Scott in 1972 if: (1) they were given to Scott in trust for use in his political campaigns or for political purposes and he diverted them to his own use in 1972, *e. g., United States v. Miriani*, 422 F.2d 150, 152 (6th Cir.), *cert. denied*, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); (2) they were payments made in 1972 for the improper purpose of influencing official conduct.

*United States v. Isaacs*, 493 F.2d 1124, 1144–45, 1161 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). Arguably they would also be taxable income in 1972 if they were given Scott out of a desire to compensate him for political or official activity, rather than from a "detached and disinterested generosity." *Commissioner v. Duberstein*, 363 U.S. 278, 285, 80 S.Ct. 1190, 1196, 4 L.Ed.2d 1218 (1960).[51] Contrary to Scott's argument on appeal, the government introduced substantial evidence from which the jury could have inferred that the likely source of Scott's net worth increase during 1972 was funds taxable to Scott in 1972.

Scott's appellate argument that the government itself proved that Scott's cash was derived from bribes or extortions or other illegally obtained funds he received prior to 1972, and not from taxable income in 1972, can be rebutted simply by looking at the evidence the government introduced at trial. The government introduced evidence from which the jury could reasonably have concluded that Scott spent at least $10,000 in cash in 1972, cash which could not be traced to any legitimate source. The total amount of the allegedly improper payments made to Scott between 1968 and December 31, 1971 was $4,600. Thus, Scott's argument fails to explain the source of Scott's remaining $5,400 in expenditures for 1972, expenditures which the government claimed were made from campaign contributions converted to personal use in 1972 or from improper payments received in 1972 (the Barrett money).

We think the government introduced sufficient evidence from which the jury could have concluded that Scott's cash expenditures in 1972 were derived from all of the types of 1972 taxable income previously discussed.

First, there was sufficient evidence from which the jury could infer that the money in the safe deposit boxes, which Scott spent

**51.** *See* note 33, *supra*.

for his personal use in 1972,[52] came from political or campaign contributions, making it taxable income in 1972, regardless of when he received it. *E. g., United States v. Miriani*, 422 F.2d 150, 152 (6th Cir.), *cert. denied*, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); *United States v. Dawson*, 400 F.2d 194, 205 (2d Cir. 1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969).[53] There was evidence that Scott converted campaign contributions to his own use in 1972: the evidence was clear that the $500 Shaffer check and the $5,000 Barrett cash contribution were both intended for Scott's political use. While the $500 was converted once Scott deposited it to his personal bank account, there is no direct evidence of what Scott did with the Barrett money. It can readily be inferred that he converted it to his own use, however, because his campaign had no records of the contribution and Barrett received no receipt from the campaign, as was routinely given Scott's contributors who gave cash to his campaign. *See* note 15, *supra*. His habit of maintaining campaign funds in cash in safe deposit boxes is known.

Second, there is sufficient evidence from which the jury could infer that the "gifts" given Scott in 1972 did not meet the standards for nontaxable gifts. *See Commissioner v. Duberstein*, 363 U.S. 278, 285, 80 S.Ct. 1190, 1196, 4 L.Ed.2d 1218 (1960). The jury, after proper instructions, evaluated the credibility of defense witnesses and rendered its verdict. It is not for us to say on appeal that the jury's evaluation of witness credibility was wrong. As the Second Circuit has stated:

whether a jury can find [underreporting of income] beyond a reasonable doubt where the net worth method . . . of proof is used is a very difficult determination for an appellate court to make upon a cold record; most of the evidence in such a record is circumstantial and an evaluation of it is often influenced by determinations of witness credibility which we are in no position to review.

*United States v. Dawson*, 400 F.2d 194, 205 (2d Cir. 1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969).

Finally, there was sufficient evidence from which the jury could have concluded that certain of the payments made to Scott in 1972 were made to compensate Scott for official conduct, rendering them taxable income in that year. There were the Barrett and Shaffer payments. Several other witnesses were employees of or Special Assistants hired by Scott, or had relatives whom he had appointed, and payments made to reward him for such acts would be income. Again, the interpretation of the intent with which these payments were made is a question for the jury, *Commissioner v. Duberstein*, 363 U.S. at 285, 80 S.Ct. at 1196, *supra*.

(b)

▮ Scott argues that the court erred in allowing the government expert witnesses, Mr. Dyas and Mr. Duffy, to testify that he could have spent more per day on food and drink while he was traveling than the $8.47 per day included in Dyas' net worth schedule for a total projected food cost for 1972 of $2,397.01. He characterizes this as speculation, along with the government's refer-

---

**52.** Even Scott's own expert witness conceded that Scott kept cash in these safe deposit boxes and was spending it. *See* Part I–B–3, *supra*.

**53.** Thus, it is irrelevant that he may have received these contributions prior to 1972. For the receipt of campaign contributions is not a taxable event. *Loftin & Woodard, Inc. v. United States*, 577 F.2d 1206, 1243 (5th Cir. 1978). Therefore, even if some of Scott's cash came from the approximately $50,000 in campaign contributions kept in the safe deposit boxes as

testified to by his former wife, Mrs. Humphrey, this money was not taxable until it was spent for personal use. And there was certainly sufficient evidence from which the jury could conclude that the money testified to by Mrs. Humphrey was campaign contributions; the jury had before it Scott's own sworn testimony in both his 1970 divorce proceedings and his 1977 child support proceedings that this money was given to him for political purposes only.

ence to undocumented lodging, transportation or entertainment expenses while traveling, and any purchases ˙of clothing, personal care, or gifts for his children. No numerical figures were attached to these latter items. They were not included in the government's net worth schedules. The government simply told the jurors that if they thought Scott spent money on any of these items, that money should be added to his net worth, over and above what the government actually calculated.

■ Proof of non-deductible expenditures—such as food, clothing, shelter and gifts—is one factor in the net worth and expenditures method of proof. *E. g., United States v. Hamilton*, 620 F.2d 712, 716 (9th Cir. 1980). The taxpayer's expenditures are added to the adjusted net values of his assets at the end of the year, and, consequently increase the figure to be compared with the opening net worth. *Id.* Government tax experts routinely add living expenses to their net worth schedules. *Id.; United States v. Goichman*, 407 F.Supp. 980, 989 (E.D.Pa.), *aff'd*, 547 F.2d 778 (3d Cir. 1976). *Cf., United States v. King*, 563 F.2d 559, 561 (2d Cir. 1977), *cert. denied*, 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1978).[54]

In this case, the only necessity of life that the government added to its net worth schedules was food. This addition was based on Scott's travel vouchers. *See United States v. Doyle*, 234 F.2d 788, 794 (7th Cir.), *cert. denied*, 352 U.S. 893, 77 S.Ct. 132, 1 L.Ed.2d 87 (1965).[55] The government's estimates probably favored Scott, as it is not unreasonable to assume that he spent more per day on food and drink in the

Bahamas or Nice, France, than he did while traveling in Illinois or on state business. Thus, it was not unduly speculative for the government to point out that anything Scott spent on food and drink above the $8.47 per day included in the government's schedules was additional unreported income.

Assertions that Scott may have spent money on traveling, or on his children or on entertainment were appropriate and not speculative, at least as applied to the circumstances of this particular case. *Id.* at 793–94. Scott left no record of any possible expenditures during 1972 on any of the necessities of life—food, clothing and shelter. Neither did he leave any record of any expenditures on his children, despite his 1977 testimony under oath that he spent approximately $184 per month on his children in addition to his child support payments. Common sense tells us that Scott must have spent some money on these items, and that these expenditures were in cash, as otherwise they could be documented. Here again, however, the government's proof favored Scott, as the government did not attempt to estimate these expenditures and then add the estimate to its net worth proof. It only told the jury that anything Scott spent on these items would increase his net worth above what the government showed. The jury was free to reject this suggestion. We see no reason why these costs cannot be referred to by the government, especially since the government's calculations of Scott's basic living costs consistently favored him.

(c)

■ Scott also contends that the court improperly instructed the jury on the fun-

**54.** In *United States v. King, supra,* the court said that defendant's income was "well in excess" of what the government's net worth schedules showed because the government did not include daily living expenses such as food, clothing, and entertainment. *Id.* at 561.

**55.** *See United States v. Hamilton*, 620 F.2d 712, 716 (9th Cir. 1980). In *Hamilton*, the taxpayer, like Scott, had no records of daily living expenses. In that case, however, the government

relied on estimates from the Bureau of Labor for what a person with Hamilton's reported income and family and financial obligations would be expected to spend on nondeductible items. It then added these estimates to Hamilton's net worth schedules. Unlike the government's case in *Hamilton*, the only daily expenses added to Scott's net worth schedules were for food.

damental issue of opening net worth for the year 1972. He alleges that the court told the jury that the starting point for the government's net worth calculations was April 16, 1968, but that it never instructed the jury that the crucial date for the government's case was January 1, 1972.

There are three crucial dates in a net worth prosecution such as this. The first is the starting point, here, April 16, 1968. This was the date from which Scott's changes in net worth were calculated. *Holland v. United States*, 348 U.S. 121, 125, 75 S.Ct. 127, 130, 99 L.Ed. 150 (1954). Scott did not contest this starting point. Any evidence of Scott's financial dealings prior to this date is relevant for establishing the accuracy of his opening net worth. The second and third crucial dates are the opening and closing dates of the prosecution period, January 1, 1972, and, for purposes of this appeal, December 31, 1972. The jury could consider any evidence of Scott's acquisition and disposition of assets between the starting point of April 16, 1968, and the opening date of the prosecution period, January 1, 1972, only for determining the accuracy of the government's calculations of Scott's net worth on January 1, 1972, unless otherwise specifically instructed. *See United States v. Balistrieri*, 403 F.2d 472, 479 (7th Cir. 1968), *vacated on other grounds*, 395 U.S. 710, 89 S.Ct. 2032, 23 L.Ed.2d 654 (1969), *reaff'd*, 436 F.2d 1212 (1971), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1620, 29 L.Ed.2d 124 (1971).

■ We have examined the court's instructions on the net worth dates and find Scott's objections to be without merit. The court carefully explained the dates and evidence the jury could consider in determining the accuracy of the government's calculations. Its instructions included the substance of Scott's suggested instruction.[56] The court need not use the exact words of an offered instruction so long as it appears from the charge as a whole that the subject matter has been fully covered. *United States v. Doyle*, 234 F.2d 788, 795 (7th Cir.), *cert. denied*, 352 U.S. 893, 77 S.Ct. 132, 1 L.Ed.2d 87 (1956).

### 2.

■ Scott contends that there was insufficient evidence of the $5,000 Edward Barrett and William J. Kiley gave him in the summer of 1972, and attribution of the payments Arthur Wirtz made to Ellen Cooper, to allow these two items to go to the jury. According to the government, Scott's failure to report either of these two items resulted in a false income tax return in violation of 26 U.S.C. § 7206(1), and proof of either is sufficient to sustain his conviction.[57]

On appeal, the question becomes whether there was sufficient credible evidence on each item for the jury to have concluded beyond a reasonable doubt that these payments were income to Scott that he should have reported on his 1972 income tax form. *United States v. Dawson*, 400 F.2d 194, 205 (2d Cir. 1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1975). In determining the legal sufficiency of this evidence, however, we are not to weigh the evidence or pass on the credibility of the witnesses. *United States v. Anderson*, 509 F.2d 312, 331 (D.C.Cir.1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672

**56.** We fail to understand Scott's argument that the court excluded his instruction No. 43, which "clearly and accurately" stated the law. Not only do we find that the court gave this instruction in substance, but the court evidently thought so as well. In the record before this court, Scott's tendered instruction No. 43 is included in the package of instructions labeled "Filed instructions given." On the second page of the instruction tendered to the court, someone has written "Given in G23" which we take to mean government instruction 23.

**57.** Scott does not appear to challenge the $500 Shaffer payment. There was sufficient evidence for the jury to conclude that this payment was intended for campaign purposes and that Scott converted it to his own use by depositing it in his personal checking account. It therefore became taxable income in 1972. *E. g., United States v. Miriani*, 422 F.2d 150, 152 (6th Cir.), *cert. denied*, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970). Scott's failure to report this payment alone sufficiently supports his conviction.

(1975). "It is our duty to sustain the jury's verdict if there is substantial evidence, in the light most favorable to the government, to support the jury's conclusion." *Id.* We think there was sufficient evidence that both items were income to Scott during 1972 which he was required to report on his 1972 Form 1040.

We set forth evidence regarding the Barrett payments in Part I–B–3, *supra.* We need not spend much time discussing its sufficiency, which we think is clear, for Scott's own attorneys as much as conceded this point in closing arguments. Mr. Bugliosi admitted that Scott failed to report the Barrett payment as a gift pursuant to the Disclosure of Economic Interest Act, Ill.Rev.Stat. ch. 127 § 604A, *et seq.* (1973). He further acknowledged the strength of the Barrett evidence when he asserted that Barrett was the only witness the government offered to prove that Scott converted campaign contributions to his own use.[58] Finally, in a last ditch effort to convince the jurors of Scott's innocence, Mr. Bugliosi told them that even if they believed that the Barrett payment was a campaign contribution which Scott had converted to his own use, it was only $5,000 and was too insubstantial to support a conviction. We disagree with Mr. Bugliosi's characterization of the payment as insubstantial, and find that the Barrett payment is sufficient evidence to support Scott's conviction.

The second major specific item of income which the government relied on was the payments made during 1972 by Arthur Wirtz, a Chicago businessman, to Ellen Cooper, whom defendant married in 1974. The government contended that Wirtz made these payments as a favor to Scott because as Attorney General, Scott possessed regulatory and enforcement powers over many of Wirtz' businesses. *See United States v. Kuta,* 518 F.2d 947, 950 (7th Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). Therefore, Scott should have reported these payments, as "the first principle of income taxation [is that] income must be taxed to him who earns it," *United States v. Basye,* 410 U.S. 441, 449, 93 S.Ct. 1080, 1085, 35 L.Ed.2d 412 (1973); *Commissioner v. Culbertson,* 337 U.S. 733, 739–40, 69 S.Ct. 1210, 1212–13, 93 L.Ed. 1659 (1949), and not another person who receives or spends it. Provided that Scott's failure to disclose this income was wilful, that is, a voluntary and intentional violation of a known legal duty, *e. g., United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976); *United States v. Garber,* 607 F.2d 92, 99–100 (5th Cir. 1979), his failure to report this "attributed income" is just as much a violation of § 7206(1) as is failure to report substantial income from any other source. *See United States v. Allen,* 551 F.2d 208, 212 (8th Cir. 1977); *United States v. Diez,* 515 F.2d 892 (5th Cir. 1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976).[59]

We conclude that the government introduced sufficient credible evidence from which the jury could have inferred that the payments Wirtz made to Cooper were motivated by Scott's office or in anticipation of services to be rendered. *United States v. Kuta,* 518 F.2d at 950, *supra.* As such, Scott "earned" the income, *United States v.*

---

**58.** Given the circumstances surrounding the contribution (the conversation, the lack of records, the substantial contract work that Barrett and Kiley received from Scott), the jury could also have reasonably concluded that this payment was really made for the improper purpose of influencing official conduct. *United States v. Isaacs,* 493 F.2d 1124, 1144–45 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). Scott's receipt of the money is therefore a taxable event in the year in which it is received—in this case, 1972. *Id.* at 1161. The court properly instructed the jury, Tr 9169, and it was their decision on how to characterize the contribution. *United States v. Anderson,* 509 F.2d at 331, *supra.*

**59.** In *Allen,* the defendant's conviction for violating 26 U.S.C. § 7206(1) was upheld, in part because defendant failed to report the commission he earned on a house he sold to his parents, even though he turned that commission over to his parents. The court said Allen had made a gift, or anticipatory assignment of income and should therefore pay taxes on it. In *Diez,* the defendants' convictions for conspiring to avoid income taxes were upheld. The conspiracy entailed the distribution of income earned by the defendant Palori to Diez and several other persons, who in turn reported this income on their tax returns.

*Basye*, 410 U.S. at 449, 93 S.Ct. at 1085, *supra*, and was bound to report it on his 1972 Form 1040. Given the manner in which Scott conducted his financial affairs, his treasurer's background and his legal knowledge, it can also be inferred that his failure to do so was wilful.

Although there was no testimony to that effect, Scott's counsel characterized these payments as disguised campaign contributions. Assuming that the jury was properly instructed, and we find that it was,[60] the characterization of these payments is properly left to them. As the Supreme Court stated with respect to the finding of a gift,

Decision of the issue presented . . . must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations . . . confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact.

*Commissioner v. Duberstein*, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960).

#### C. *Other Arguments*

Scott contends that rather than trying him for filing false income tax returns, as charged in the indictment, the government was allowed to try him for his bad character, his "secret life."[61] Scott accuses the government of overemphasizing unindicted acts in both its opening and closing arguments. He contends that this emphasis caused the jury to return a guilty verdict on Count One of the indictment charging a violation for 1972, but not on the remaining counts for the years 1973 through 1975, suggesting that most of the nonindictable and unindicted offenses for which he was allegedly tried took place prior to 1972.

---

**60.** The court properly refused Scott's tendered instructions treating the Wirtz payments as campaign contributions (defendant's instructions 98, 99), as he offered no evidence in support of this theory. *E. g., United States v. Walsh*, 627 F.2d 88, 93 (7th Cir. 1980).

**61.** From the beginning of the trial, the government characterized its case as "the story of the secret life of William J. Scott." Mr. Margolis, Assistant United States Attorney, began the opening statement for the government as follows:

Judge Crowley has told you repeatedly today about the Government's burden of proof, our burden to prove the defendant guilty beyond a reasonable doubt. We accept it, and we will meet it.

Let me give you a little background about Mr. Scott. He is not a man who comes from a wealthy family. He is not a man who has held the sort of jobs that should make you rich. He has worked in public relations and advertising for local banks. He worked for six months in our office.

He began his career in public life in 1962 when he was elected Treasurer of the State of Illinois, and he served there for four years.

He left office in 1967, and in 1967 the Citizens Committee for William Scott for Public Office was formed. That was a campaign committee headed by civic leaders, the purpose of which was to insure regularity and integrity in the raising of campaign funds and the conducting of campaign finances.

In 1968 Mr. Scott was elected Attorney General, and he serves in that office until this day.

The government has no quarrel with the fine work done by the hard-working men and women of that office. That's not what this case is all about.

Mr. Scott would appear to be a government official who earns a salary, and, like all of us, just tries to make ends meet. But that is not the William J. Scott that this case is all about. This case is about a different William J. Scott. This case will tell you the story of the secret life of William J. Scott.

Mr. Bugliosi: I object, your Honor. This is argument. United States v. DeRosa specifically says that the prosecutor in his opening statement cannot make an argument to the jury, which this prosecutor is doing right now.

The Court: Overruled. You may proceed.

Mr. Margolis: We will tell you about his secret life, and we will tell you how he paid for it.

Let me tell you what the evidence will show. It will show that it involved secret safe deposit boxes. It involves the secret use of campaign funds. It involves secret financial transactions with people who stand to make money with the State of Illinois by currying favor. It involves secret travel all around the world. It involves the secret of going for years at a time without using your paycheck, without writing a single check to cash, without needing your paycheck to pay

■ We have examined the record in this case carefully. We have found no error, constitutional or otherwise, in either the proof admitted at trial or in the government's opening and closing arguments. The evidence Scott complains of was properly admitted as necessary for proving Scott's net worth, corroborating certain expenditures, rebutting defense testimony, and proving intent. The court was clearly within its discretion in determining that its probative value was not substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403. The court carefully limited the jury's use of testimony having to do with financial transactions prior to the indictment years, both when the evidence was admitted, and during its final charge to the jury. That the jury carefully followed these instructions is evidenced by its refusal to return a conviction for the year 1975, a year for which the most potentially prejudicial proof was admitted.[62] Insofar as the government emphasized any of the acts which could reflect adversely on Scott's character, we think it never crossed the line between being "harsh . . . but fair," *United States v. Spain*, 536 F.2d 170, 175 (7th Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976), and "undignified and intemperate," *Berger v. United States*, 295 U.S. 78, 85, 55 S.Ct. 629, 632, 79 L.Ed. 1314 (1935), so as to require a new trial. Although inflammatory argument may be grounds for reversal, the government should not be restricted to a sterile recitation of uncontroverted facts. *United States v. Falk*, 605 F.2d 1005, 1010–1013 (7th Cir. 1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980) *citing United States v. Greene*, 497 F.2d 1068, 1085 (7th Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). "Unflattering characterizations of a defendant will not provide a reversal when such descriptions are supported by the evidence." *United States v. Keane*, 522 F.2d 534, 560 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976) *citing United States v. Windom*, 510 F.2d 989, 994 (5th Cir.), *cert. denied*, 423 U.S. 863, 96 S.Ct. 121, 46 L.Ed.2d 91 (1975).

Scott points to the verdict of acquittal on four counts and asserts that the jury "inexplicably" found him guilty of understating his adjusted gross income only for the year 1972, although the evidence as to all counts was "virtually the same."

Consistency is not required in a jury verdict, of course, but there is a ready possible explanation here. Very conceivably, the jury may have been somewhat impressed by the gift testimony and unwilling to find guilt beyond a reasonable doubt, based on the net worth proof alone, and hence have acquitted him on Counts Three, Four and Five. Again, since Ms. Cooper reported and paid tax on the Wirtz payments, the jury may have entertained a reasonable doubt as to Scott's wilfulness in failing to report them as his income, hence acquitting him of Count Two as well. But as to 1972, there was not only net worth proof, and proof of the Wirtz-Cooper payments, but also the Barrett payment, proof of which defense trial counsel virtually conceded, and the Shaffer payment.

Nor can we find any unfair comments in the government's closing arguments when considered in the context of the entire closing arguments, which took three days, and the entire trial, which lasted for over two months.

for the ordinary expenses of life, like food, clothes, shelter, entertainment.
Let me tell you what the evidence will show. We will present the evidence to you in nine chapters, much like nine chapters of a book. It's a book about his secret life. Tr 375–76. We do not think this characterization of a "secret life" is an unfair one, given Scott's lack of financial records and the number of days during which his whereabouts were "unknown." *See* Gov't Ex. TL–3.

**62.** Evidence of a trip Scott took to Jamaica in February, 1975 with a female acquaintance and his intention to meet her in Italy in the fall of 1975 was admitted to: (1) corroborate the circumstantial evidence showing that Scott traveled to Jamaica in 1975; (2) provide circumstantial evidence of his undocumented travel expenses; (3) corroborate travel logs which place Scott through calls he made to the woman's home and office; and (4) to rebut his argument that his travel was not shown to be for personal purposes.

Scott also argues that the court's instructions misinformed the jury regarding the manner in which his adjusted gross income for 1972 was to be calculated. We have examined those instructions and find Scott's contentions of error to be without merit. The court properly instructed the jury on business expenses, adjustments to income and the tax consequences of political expenditures. The instructions Scott complains were refused were given in substance.

The judgment is Affirmed.